367 So.2d 815 (1979)
STATE of Louisiana, Appellee,
v.
George Herbert ENGLISH, Appellant.
No. 62823.
Supreme Court of Louisiana.
January 29, 1979.
Rehearing Denied March 5, 1979.
*816 Kenneth Michael Wright, Rester, Van Norman & Wright, Max M. Morris, Lake Charles, for appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Frank T. Salter, Jr., Dist. Atty., Adam L. Ortego, Jr., Asst. Dist. Atty., for appellee.
TATE, Justice.[*]
The defendant English was indicted for first degree murder. La. R.S. 14:30 (1976). He is charged with the intentional killing of Roland Lampris on September 5, 1977. He pleaded not guilty and not guilty by reason of insanity. After trial by jury, he was found guilty as charged. After the post-verdict sentencing hearing, La.C.Cr.P. arts. 905.1-905.9 (1976), the jury unanimously recommended that the death penalty be imposed. The district court accordingly sentenced the defendant to death.
English now appeals his conviction, urging fifteen assignments of error. Some of these relate to the guilt-determination portion of the trial, and some relate to the sentencing portion. Since we find reversible merit in some of these latter assignments, requiring us to set aside the death sentence, we will discuss the latter first.

I. THE SENTENCING HEARING ASSIGNMENTS OF ERROR
The defendant's trial was conducted in accordance with the provisions of La.C.Cr.P. arts. 905.1-905.9 (1976), which provide for a bifurcated trial in capital cases. Initially, the jury is required only to make a determination as to the guilt or innocence of the defendant. If a verdict of guilty is returned, however, the same jury is required, during a second or sentencing phase of the trial, to recommend whether the defendant should be put to death or given a sentence of life imprisonment, without benefit of parole, probation, or suspension of sentence. This determination is to be made based upon a consideration by the jury of various statutory aggravating and mitigating circumstances, which are set forth in La.C. Cr.P. arts. 905.4 and 905.5.
At the conclusion of the sentencing hearing, the jury returned a unanimous recommendation that the defendant be sentenced to death. It based this recommendation upon its finding that the state had proven beyond a reasonable doubt (see La.C.Cr.P. art. 905.3) the existence of the following aggravating circumstances: (1) the offender was engaged in the perpetration of aggravated kidnapping; (2) the offender was previously convicted of an unrelated murder; (3) the offender knowingly created a risk of death or great bodily harm to more than one person; and (4) the offense was committed in an especially heinous, atrocious and cruel manner. See La.C.Cr.P. art. 905.4(a), (c), (d), and (g), respectively.
The post-verdict sentencing hearing shall be conducted in accordance with the rules of evidence and trial procedure applicable to the trial on the merits.[1] Thus, for instance, hearsay evidence is inadmissible in the same manner that it would be at the trial. Likewise, error in the instructions of the trial court to the sentencing jury requires reversal of the sentence, if prejudicial *817 to the convicted defendant in the jury's arriving at its sentencing recommendation.
In the present instance, the admission over defendant's objection of hearsay evidence (Assignment 13) was prejudicially erroneous and requires reversal of the sentence of death recommended by the jury and imposed by the trial court. We likewise note the trial court's arguably erroneous refusal to grant a special instruction as to a mitigating circumstance (Assignment 14).
Assignment 13
One of the aggravating circumstances successfully relied upon by the state in arguing for the death penalty is that English, the "offender was previously convicted of an unrelated murder," La.C.Cr.P. art. 905.4(c) (1976). While a soldier in Vietnam, in 1969 the defendant English was convicted before a court martial of the killing of a Vietnamese civilian and sentenced to twenty years imprisonment.
To prove the prior conviction, the state did not rely upon duly-authenticated records prepared by the Army. Instead, over defendant's objection the state proved the fact of this prior conviction by the testimony of the accused's parole officer, who testified that the federal parole records in his possession showed that the defendant had been convicted of murder in 1969 before a court of military justice.
The witness admitted that his information was merely based upon documents (of unknown nature) in the file concerning the accused, which had not been prepared by him and of which he had no personal knowledge concerning their preparation or contents.
The defendant vigorously and repeatedly objected to the proof of this prior conviction by the hearsay evidence of this officer.
Hearsay evidence is testimony in court, or written evidence, of an out-of-court statement offered to show the truth of the matter asserted therein and resting for its value upon the credibility of the out-of-court asserter. State v. Martin, 356 So.2d 1370 (La.1978); McCormick on Evidence, Section 246 (2d ed. 1972); Pugh, Louisiana Evidence Law, 387 et seq. (1974). The traditional exclusion of hearsay evidence is based upon considerations of unreliability and of potential unfairness to the accused to permit the introduction of out-of-court statements which cannot be tested by cross-examination of the out-of-court declarant. State v. Hudson, 361 So.2d 858 (La.1978); State v. Ford, 336 So.2d 817 (La.1976). See also Pugh, Louisiana Evidence Law 388-432 (1974).
In Louisiana criminal trials, hearsay evidence is inadmissible except under certain recognized exceptions. La. R.S. 15:434. In brief in this court, the state points out no exception permitting admissibility of this statement of a witness, based upon his examination of office records of unshown nature, to prove that the accused had been convicted of a murder in Vietnam in 1969. Even if the parole office record itself had tendered as proof of the fact noted in its contents, these records do not fall within the official records exception, permitting the officer entrusted with the duty to make and retain a record of the fact to certify its existence as reflected by his records, based upon his first-hand knowledge of such a record. See State v. Nicholas, 359 So.2d 965, esp. 969 (La.1978).[2]
The hearsay proof of the prior conviction for murder was thus erroneously admitted over objection. This evidence was inadmissible under the rules of evidence applicable to sentencing hearings, and it *818 was the chief evidence of this prior conviction.[3] Even though we (and the jury) might feel to be reliable a federal law enforcement officer's testimony that he had received information that the defendant had been convicted of an earlier killing, under the law of evidence this hearsay testimony is no more admissible to prove the earlier conviction than would be the equally hearsay report of a stranger or a neighbor that he had heard that the accused had been convicted of an earlier crime.
The improper admission into evidence of this hearsay evidence of the prior conviction was obviously prejudicial to the defendant in the proof of this aggravating circumstance which, if proved, entitled the jury to recommend the death penalty.
The prejudice is especially great under present circumstances: Under our independent review of the excessiveness of the death sentence directed by statute, La.C. Cr.P. art. 905.9 (1976) and our court rule adopted in accordance therewith, Rule 28 (Rule 905.9.1) (1977), it is unlikely or at least arguable that we would have found that any other aggravating circumstance was proved. See Appendix attached to this opinion. The death penalty may not be imposed unless at least one statutory aggravating circumstance is found to exist beyond a reasonable doubt. La.C.Cr.P. art. 905.3 (1976).
Assignment 14
In the sentencing portion of the hearings, the defendant was denied certain special charges requested. La.C.Cr.P. art. 807 provides: "* * * A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given."
In the general charge in the innocence-guilt trial on the merits, the trial court had instructed the jury that "an insane person is one who is incapable of distinguishing between right and wrong." (See La. R.S. 14:14, providing this to be the test of insanity for exemption from criminal responsibility for the act, i. e., for purposes of the plea of not guilty by reason of insanity.)
After the sentencing evidence was taken, the defendant timely requested several special charges.
A mitigating circumstance provided by La.C.Cr.P. art. 905.5(e) is: "At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease of defect or intoxication." In explanation of this mitigating circumstance, the defendant requested Special Charge 7.
Pertinent for present purposes, this special charge requested that the jury be instructed that "a mental defect would be a defect or deficiency in the emotional, psychic, or intellectual function of a person which rendered the mind deficient for the purpose for which the mind is to be used. Mental disease means a person is suffering from an illness which lessens his capacity to use his customary self-control, judgment, and discretion in the conduct of his affairs and social relations. . . . A mental disease or defect is not to be confused with insanity, as to which you have been previously instructed."
The trial judge rejected this special instruction, apparently accepting the state's contention that the test of legal insanity (the right-wrong test, La. R.S. 14:14) for innocence or guilt also governed the test of the mitigating circumstance relating to the *819 offender's mental defect or disease, La.C. Cr.P. art. 905.5(e).
At the sentencing hearing, only three witnesses testified: the federal probation officer, and the two psychiatrists who had served on the sanity commission which found the accused legally sane under the right-wrong test. These doctors testified that, while the defendant had been intermittently under psychiatric treatment since a child of nine, he was legally sane and appreciated the consequences of his acts and thus knew right from wrong. They testified that he was suffering from a severe psychiatric illness (known as psychopathy or an anti-social personality) characterized by an emotional flatness and lack of conscience.
In his closing argument, the district attorney relied heavily upon these doctor's testimony that the defendant "knew right from wrong," and adverted to his arguments in the earlier guilt-innocence stage of the trial that mental defects and mental illnesses do not affect the criminal responsibility of an individual.
Under the circumstances shown, the defendant was clearly entitled to a special instruction of the nature requested.
Without it, the jury had been instructed by the court, without correction at the sentencing hearing, that the test of the defendant's criminal responsibility was solely provided by the right-wrong test. While this is a correct statement of law insofar as the determination of whether the accused is not guilty by reason of (legal) insanity, once the accused's guilt has been established by the verdict at the merit-trial another dimension of his mental condition comes into play as affecting whether the jury shall recommend that he be put to death.
The legislature specifically provided that, in the sentencing hearing, the jury may consider as a mitigating circumstance that "At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law were impaired as a result of a mental disease or defect or intoxication." La.C.Cr.P. art. 905.5(e). By permitting the jury to consider the mental condition of the offender as a mitigating circumstanceeven though he was guilty, because his mental condition did not meet the right-wrong requirements of legal insanity, La. R.S. 14:14, it is obvious to us that the legislature intended to permit the jury to take into consideration, in deciding not to impose the death penalty, an abnormal mental condition short of legal insanity. It may be a mental disease or defect which diminishes the offender's capacity for self-control and for forming the specific and deliberate intention to cause the killing charged,[4] or it might be such other mental disease or defect affecting the act as the jury might feel was of a nature that indicated that the ultimate penalty of death should not be imposed.
The effect of the trial court's denial of the special charge, under the circumstances shown, was to indicate to the jury that the test of the mitigating circumstance was the same as the test of legal insanity, and to deny the jury the opportunity intended for it by the legislature to consider the defendant's psychiatric illness as a mitigating circumstance by reason of which it might decide not to recommend the death penalty. (We do not imply, however, that the refusal *820 of a properly instructed jury to consider the present accused's mental illness a mitigating circumstance would necessarily be deemed erroneous on review.)
We omitted from discussion portions of the requested charge that may or may not have been wholly correct and pertinent. Since it is necessary to reverse the death sentence because of the hearsay error (Assignment 13), we do not reach the issue of whether these omitted portions would have justified, if slightly incorrect,[5] the trial court in totally rejecting this requested special charge on this essential issue of the sentencing hearing in this capital case.
Appropriate Decree after Reversal of Death Sentence
The murder occurred on September 5-6, 1977. At that time, the law applicable to sentencing hearings was provided by La.C. Cr.P. arts. 905.1 to 905.9, as enacted by Act 694 of 1976. The provisions of this act relating to the jury's sentencing recommendation were:
"[T]he sentencing hearing shall be conducted before the same jury that determined the issue of guilt. The order of sequestration shall remain in effect until the completion of the sentencing hearing." La.C.Cr.P. art. 905.1.[6] (Italics ours.) "The court shall sentence the defendant in accordance with the recommendation of the jury. If the jury is unable to unanimously agree on a recommendation, the court shall impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence." La.C.Cr.P. art. 905.8.
As thus originally enacted, the death penalty could not be imposed unless unanimously recommended by the same jury that determined the issue of guilt. No provision was made for the appropriate decree on appeal if reversible error was found in the sentencing hearing, although not in the guilt-trial itself.
Since the same jury that decides guilt must (under the statute) be the jury to recommend the death penalty, defense counsel argues that therefore, upon finding reversible error in the sentencing hearing, the appellate court must set aside not only the sentence itself but also the conviction. A new trial is required, the defendant argues, in order that a guilt deciding jury (alone entrusted by the statute with the power to recommend death) be empaneled which is empowered to recommend the death penalty.[7]
However, the 1976 statute does not require that the conviction be set aside if there is reversible error in the sentencing hearing. It does not specifically regulate this situation. Nevertheless, it does provide that, if the sentencing jury is unable to agree unanimously on death, theninstead of declaring a mistrial and setting aside the conviction toothe court shall impose a life sentence. La.C.Cr.P. art. 905.8.
In conjunction with the power of the appellate court to set aside the death sentence and impose a sentence of life imprisonment, La.C.Cr.P. art. 905.8, the most reasonable construction of the 1976 statute as a whole is that, upon finding reversible error in the sentencing hearing, the reviewing court should not reverse the conviction but only the sentence. Accordingly, upon such limited reversal, the reviewing court should remand the case in order that the trial court may resentence the convicted defendant to life imprisonment without benefit of probation, parole, or suspension of sentence.
*821 By Act 105 of 1977 (effective shortly after the crime, and thus not applicable to this trial, see footnote 6), the legislature amended La.C.Cr.P. art. 905.1 (1976) so as to authorize, for the first time, the empaneling of a new jury for the sentencing hearing, if a mistrial or new trial or reversal is required because of trial error in the sentencing hearing itself.[8]
The enactment of this amendment, effective after the crime, poses an ex post facto issue:
May it be applied in the instant case, as to remand the case for a sentencing hearing which might result in a death recommendation? Or, instead, must we apply the law in effect at the time of the crime, which, as we have seen, requires a re-sentencing to life imprisonment instead of a remand for new sentencing hearing which may result in the imposition of the death penalty?
Any law enacted after the commission of an offense for which the accused is tried is prohibited as an ex post facto law, U.S. Constitution, Article 1, Section 9, Louisiana Constitution, Art. 1, Section 23 (1974), where it inflicts a more severe punishment than the law annexed to the crime at the time it was committed, or where it changes the law to the material disadvantage or detriment of the accused. State v. Curtis, 363 So.2d 1375 (La.1978) and federal and Louisiana decisions cited and summarized therein.
On the other hand, a procedural change, when it does not affect the accused's substantive rights in the prosecution of a criminal offense, may nevertheless be applicable to the trial of the offense, even though the crime was committed before its effective date. State v. Carter, 362 So.2d 510 (La. 1978); cf., State v. Martin, 351 So.2d 92 (La.1977).
The 1977 amendment, effective after the present crime, cannot be considered as a merely procedural change. Instead, its application to the present prosecution is constitutionally prohibited under ex post facto principles:
Before the change, if reversible error occurred in the sentencing hearing, the greatest penalty imposable upon the accused was life imprisonment. After the change, however, the death penalty might be imposed upon him, if upon the remand for a new sentencing hearing the new jury recommended such penalty. The constitutional prohibitions against ex post facto laws prohibit the defendant's exposure to this more severe punishment than would be applicable under the laws in effect at the time the crime was committed.
Accordingly, the death sentence must be reversed, and the case must be remanded for re-sentencing in accordance with the views above expressed.

II. THE MERIT-TRIAL ASSIGNMENTS OF ERROR
Twelve assignments were filed urging error which allegedly required reversal of the conviction.
Assignments 3 and 11
A most serious issue is presented by Assignments 3 and 11. These complain of the district court's refusal to grant a continuance sought on the day (March 13) for which the trial had been re-fixed.
Earlier motions for continuances had been granted for trial dates previously set of October 24,1977, November 14,1977, and *822 January 9, 1978. The basis for these continuances was to obtain information relating to the psychiatric care and diagnosis of the defendant English while he was in military custody Fort Leavenworth.
The last continuance was obtained on January 6, 1978 (and the trial was thereafter re-fixed for March 13 the date it commenced), on the basis that the defendant's counsel had finally located a Dr. Dupuis in New York, who had extensive knowledge (based on his observation and diagnosis of the defendant at Ft. Leavenworth) of the defendant's mental condition and was of the opinion that the accused was insane. The trial court granted the continuance and signed a certificate for the issuance of an out-of-state subpoena to compel the appearance of Dr. Dupuis at the trial, see La.C. Cr.P. art. 741.
For some reason, the original subpoena was not prepared or sent. Therefore, on March 7 (six days before the trial), the defense counsel moved for and obtained a new order for service of the out-of-state subpoena, which was mailed to the Sheriff of New York County on that date by the Sheriff of Calcasieu Parish.
On the day (March 13) set for the trial, no return on the subpoena had been filed.[9] The denial of the continuance presents a very serious issue of prejudicial error. By it, arguably the accused was deprived of an opportunity to present the testimony of a witness as to his defense of not guilty by reason of insanity (and possibly his only one), who was also an extremely material witness on his behalf as to mitigating circumstance (his mental disease or defect, La.C.Cr.P. art. 905.5(e)), by reason of which the jury might not recommend the death penalty at the sentencing hearing.
Ultimately, we conclude that the trial court's denial of a continuance, under all the circumstances of this case, is not a reversible abuse of its discretion.
The accused had obtained three prior continuances to enable him to prepare this defense.
Considering also the necessity for a hearing in New York before a judge of that state for him also to determine that the subpoenaed witness to be material and necessary for the Louisiana proceeding, see McKinley's Criminal Procedure Law of New York, Section 640.10, and even assuming that the second request of March 7 (six days before the trial date) represented due diligence, La.C.Cr.P. art. 709(3), we are unable to say that the defendant was sufficiently able to show that the New York physician could in fact be secured to testify at a date to which the trial would be continued, La.C.Cr.P. art. 709(3), taking into consideration also the multiple continuances previously given to the accused to secure evidence of the nature for which this last continuance also was sought. In finding the denial non-reversible, we also take into consideration that the chief actual prejudice caused by the unavailability of this physician's testimony, as reflected by the record, would his failure to testify as to a mitigating mental condition at the sentencing hearingand, since we have already set aside the death penalty recommendation that his testimony might have avoided, we cannot say that the accused suffered such substantial prejudice as to require reversal also of the conviction itself.
Other Assignments of Error
None of the other assignments present reversible error, nor do any of them involve legal issues not governed by clearly applicable legal principle. We have therefore noted our disposition of them in Appendix II attached to this opinion, which remains a public record of this court but which will not be published with this opinion.

Decree
For the reasons assigned, we affirm, the conviction, but we set aside the sentence and remand to the district court for re-sentencing of the defendant to life imprisonment without benefit of probation, parole, or suspension of sentence.
*823 CONVICTION AFFIRMED; SENTENCE SET ASIDE, AND CASE REMANDED FOR RE-SENTENCING.
SUMMERS, C. J., and MARCUS, J., dissent.

APPENDIX
In our appellate review of the sentence imposed, this court is required not only to determine whether reversible error occurred, but also to make an independent fact determination in every sentence of death to determine if it is excessive. La.C. Cr.P. art. 905.9.
Louisiana Supreme Court Rule 28 (Rule 905.9.1) Section 1, adopted pursuant to that code article, provides that in determining whether the sentence is excessive the court shall determine:
"(a) Whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
"(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
"(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
The record does not fairly support the jury's finding that two other of the aggravating circumstances were present, namely, (1) that the murder was committed during the perpetration of an aggravated kidnapping,[1] and (2) that the offense was committed in an especially heinous, atrocious and cruel manner.[2] Further, it is at least arguable whether the other aggravating circumstance relied upon by the jury was proved beyond a reasonable doubt, namely (3) that the defendant knowingly created a great risk of great bodily harm to more than one person.[3] We so conclude, because:
(1) The jury found beyond a reasonable doubt that the murder occurred in the course of an aggravated kidnapping. By abducting the victim and his companions, the defendant did commit simple kidnapping, ". . . the [i]ntentional and forcible seizing and carrying of any person from one place to another without his consent." La.R.S. 14:45 (1966). Aggravated kidnapping, however, demands the additional proof of "the intent . . . to force the victim, or some other person, to give up anything of apparent, present or prospective value . . . In order to secure a release of the person under the offender's actual or apparent control." La.R.S. 14:44 (1950) (Italics supplied). Arguably, the extinction of a debt by killing the creditor is the gaining of something of value under the statute, but there is not evidence that the defendant intended to condition the release of the victim upon the payment of ransom, and it is that intent which distinguishes aggravated from simple kidnapping.
(2) The jury also found that the murder was committed in an especially heinous, atrocious or cruel manner. There are unfortunately few delicate methods of committing murder, and none of them involve the use of a gun. However, any system that seeks to distinguish rationally among murders in terms of heinousness must necessarily incorporate into that concept some idea of torture or the pitiless infliction of unnecessary pain on the victim. See Proffitt v. Florida, 428 U.S. 242, 254-57, 96 S.Ct. 2960, 2967-68, 49 L.Ed.2d 913, 917-18 (1976) and Gregg v. Georgia, 428 U.S. 153, 201-02, 96 S.Ct. 2909, 2938, 49 L.Ed.2d 859, 877 (1968). As these decisions indicate, absent such limiting judicial construction the statutory terms are open to attack as unconstitutionally vague and overbroad and thus furnishing insufficient objective standards as guidelines so as to avoid their arbitrary and discriminatory application in the imposition of the death penalty.
In the present case, the victim was shot twice and bludgeoned once. However, as the coroner testified, any of the wounds would have proven fatal. They were intended to kill, not maim, cripple, or torture in a conscienceless and merciless manner.
*824 (3) The jury also found that the defendant knowingly created a risk of death or great bodily harm to more than one person. We agree that the evidence supports the theory that the defendant intended to kill each of the three persons abducted. However, it appears that the defendant intended to commit each murder by a distinct act, that is, by shooting each intended victim individually at short range.
Arguably, the commission of any one of the individual murders would not have created the risk of death or great bodily harm to the other intended victims during the murder of the individual victim. This suggestion is supported by the fact that the killing of the victim did not cause injury or death to the other intended victims, both of whom escaped. Arguably, the legislature may have intended this aggravating circumstance to apply only to situations in which, for instance, the defendant sets a fire or explodes a bomb in an inhabited building, or shoots randomly into a crowd, where the same act which kills the victim also knowingly creates a risk of death or great bodily injury to more than one person.
The more probable legislative intent is that the extreme penalty of death may be justified when the single consecutive course of conduct contemplates and causes the knowing creation of great risk of death or great bodily harm to more than one person, as here. See Proffitt v. Florida, 428 U.S. 242, 256, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 859, 918 (1976). The latter judicial construction (or either, for that matter) provides sufficient objective guidelines to guard against arbitrary and capricious infliction of the death penalty, so as to save from unconstitutionality the statutory standard. Id.
NOTES
[*] Chief Judge L. Julian Samuel participated in this decision as Associate Justice Ad Hoc sitting in the place of Chief Justice Sanders, retired.
[1] La.C.Cr.P. art. 905.2 (1976) provides: "The sentencing hearing shall focus on the circumstances of the offense and the character and propensities of the offender. The hearing shall be conducted according to the rules of evidence. Evidence relative to aggravating or mitigating circumstances shall be relevant irrespective of whether the defendant places his character at issue. Insofar as applicable, the procedure shall be the same as that provided for trial in the Code of Criminal Procedure. The jury may consider any evidence offered at the trial on the issue of guilt. The defendant may testify in his own behalf. In the event of retrial the defendant's testimony shall not be admissible except for purposes of impeachment." (Italics ours.)
[2] Here, the parole officer could only testify at best from second-hand knowledge that someone else had reported the fact of the conviction. See Nicholas at 359 So.2d 969.

The state could, of course, have introduced certified copies of official documents of the military court or defense department agency entrusted with the duty to make and retain the record of the fact of the conviction, which (properly authenticated) would have been admissible to prove the conviction. State v. Nicholas, cited in text. The state would also have to prove that the accused was the same person as the individual convicted in 1969 in Vietnam. State v. Lee, 364 So.2d 1024 (La.1978).
[3] Additionally, the state sought to prove the prior conviction by eliciting testimony from the two doctors, who served on the defendant's sanity commission, to the effect that the defendant had confessed to the prior killing and conviction during their interviews with him. The admission of this testimony was also objected to at the time of the testimony.

This testimony was clearly inadmissible. As stated in State v. Aucoin, 362 So.2d 503, 505 (La.1978), by tendering his mental health as an issue by his plea of not guilty by reason of insanity the defendant waives the physician-patient privilege, La. R.S. 15:476, only as to such information as is genuinely relevant to the narrow issue there tendered.
[4] This consideration by the jury is analogous to consideration in other jurisdictions of the defense of diminished responsibility or capacity. See, Comment, Partial Insanity Affecting the Degree of a Crime, 22 La.L.Rev. 664 (1962); Arenella, The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage, 77 Col.L.Rev. 827 (1977); Comment, Diminished CapacityRecent Decisions and an Analytical Approach, 30 Vand.L. Rev. 213 (1977). LaFave and Scott, Criminal Law, Sections 37, 42 (1972).

Although Louisiana is among the minority of states that reject the defense of diminished responsibility as it relates to the guilt or innocence of the defendant, see State v. Jones, 359 So.2d 95 (La.1978) and authorities cited therein, the legislature may well have intended that a similar concept be applied to a determination of whether the death penalty should be inflicted upon the defendant.
[5] The portions of the requested instruction omitted by us, if incorrect, are so because less favorable to the accused than the law requires.
[6] This provision was amended by Act 105 of 1977 to resolve the problem of the appropriate appellate decree upon finding error in the sentencing hearing. See footnote 8 below. However, the effective date of this act was September 9, 1977. See certificate of Secretary of State, State of Louisiana, Acts of the Legislature, Regular Session 1977, Volume I, p. iii. The 1977 statute was therefore not applicable to the present prosecution.
[7] Aside from practical difficulties in reassembling the original jury long after the original trial, the statute itself provides that the jury must remain sequestered through the merit-trial and the sentencing hearing. See La.C.Cr.P. art. 905.1 (1976).
[8] As re-enacted in 1977, La.C.Cr.P. art. 905.1 now provides:

"A. Except as provided in Part B herein, the sentencing hearing shall be conducted before the same jury that determined the issue of guilt. The order of sequestration shall remain in effect until the completion of the sentencing hearing.
"B. If an error occurs only during the sentencing hearing which would necessitate the declaration of a mistrial, or the granting of a new trial by the trial court, or if an appellate court finds an error that occurred only in the sentencing hearing which would necessitate a remand and a new trial, then the trial court shall be empowered to empanel a new jury under the same procedure set out in Title XXVI, Chapter 3 of The Louisiana Code of Criminal Procedure for determining only the issue of penalty, and the rule of sequestration shall apply to the new jury so empanelled."
[9] The record shows that, for some reason, the New York Sheriff did not receive the communication until March 22, after the trial had concluded.
[1] La.C.Cr.P. art. 905.4(a).
[2] La.C.Cr.P. art. 905.4(g).
[3] La.C.Cr.P. art. 905.4(d).