458 So.2d 1235 (1983)
STATE of Louisiana
v.
Herbert WELCOME.
No. 82-KA-2232.
Supreme Court of Louisiana.
May 23, 1983.
On Rehearing June 14, 1984.
Rehearing Denied December 6, 1984.
*1237 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Bernard E. Boudreaux, Jr., Dist. Atty., Dracos D. Burke, Asst. Dist. Atty., for plaintiff-appellee.
Walter J. Landry, Poteet & Landry, Lafayette, for defendant-appellant.
DENNIS, Justice.
On August 21, 1981, defendant Herbert Welcome shot and killed his aunt, Dorothy Guillory, and her paramour, Wallace Maturin, outside the house in which defendant resided with his mother.
According to the testimony of eyewitnesses, as the victims, Guillory and Maturin, were visiting on the front porch of the house, Welcome quarrelled with Maturin about the ownership of a pocketknife. The argument developed into a scuffle between Welcome and Maturin in front of the house. Dorothy Guillory entered the struggle by striking Welcome several times on the head with her purse.
*1238 A hand gun Welcome was carrying fell to the ground. Guillory shouted for Maturin to get the weapon, but Welcome grabbed it first and began shooting. He fired upon Maturin three times at close range and Maturin fled around the corner of the house. Welcome followed and shot him several more times. Maturin died almost immediately from his wounds.
Defendant returned to the front of the house and called out threats to Guillory as he reloaded his weapon. Guillory fled through the house and down a nearby street. Defendant ran Guillory down and shot her several times. She died three days later from multiple gunshot wounds.
At the time of the killings the ages of the persons involved were as follows: Guillory, 57; Maturin, 46; Welcome, 28.
On September 24, 1981, a grand jury indicted defendant, Herbert Welcome, with two counts of first degree murder. In April 1982, a jury convicted the defendant of both charges and recommended a sentence of life imprisonment for the death of Wallace Maturin and a sentence of death for the murder of Dorothy Guillory. The trial court sentenced the defendant in accordance with the jury's recommendations.
On appeal defendant filed fourteen assignments of error. We find no merit in these assignments and affirm the defendant's convictions and sentences.

ASSIGNMENT OF ERROR NUMBER ONE
By this assignment of error the defendant contends that the trial court erred in allowing the state to introduce his confession because he was not brought before a judge within 72 hours after arrest as required by Louisiana Code of Criminal Procedure Article 230.1.
Defendant Welcome was arrested about 6:30 p.m. on Friday, August 21, 1981. He was brought before a judge and advised of his right to appointed counsel on Tuesday, August 25, 1981. The exact time of this hearing is not clear from the record. During the interval between arrest and the appearance, the defendant made several incriminating statements. Before trial, defendant moved to suppress the statements which he alleged to be the products of his illegal confinement. The trial judge denied his motion.
Article 230.1 of the Louisiana Code of Criminal Procedure provides in part:
"A. The sheriff having custody of an arrested person shall bring him promptly, and in any case within seventy-two hours from the time of the arrest, before a judge for the purposes of appointment of counsel. Saturdays, Sundays, and legal holidays shall be excluded in computing the seventy-two hour period referred to herein.

B. At this appearance, if a defendant has the right to have the court appoint counsel to defend him, the court shall assign counsel to the defendant. The court may also, in its discretion, determine or review a prior determination of the amount of bail." (emphasis added.)
* * * * * *
According to the statute, an arrested person may not be confined without being brought before a judge for a period longer than seventy-two hours. However, the article expressly excludes Saturdays and Sundays from the computation of this time period.
Consequently, Welcome was not confined for a period beyond that allowed by law. He was arrested on Friday night. Even if we assume that his hearing did not occur until Tuesday night, the seventy-two hour statutory period had not elapsed because the intervening Saturday and Sunday are not counted under the express language of article 230.1.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO
By this assignment of error, the defendant contends that the trial court erred in excusing, upon the state's challenges for *1239 cause, certain jurors who indicated reservations about the death penalty.
The record indicates that the state challenged seven prospective jurors for cause because of their responses relative to the death penalty. Each of these prospective jurors indicated that they would not impose the death penalty under any circumstances.
Under the United States Constitution, not every attitude against the death penalty may serve as grounds for excluding a potential juror. The High Court has held that the death penalty may not be imposed or recommended by a jury from which potential jurors who voiced a general objection to the death penalty were excluded. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Similarly, a state may not preclude potential jurors from service merely because they were unable to swear that a mandatory penalty of death or life imprisonment would not affect their deliberations on any issue of fact. Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).
Our law does not allow the state to challenge for cause prospective jurors who voice general objections to the death penalty. Rather in 1968, after the Witherspoon decision, the legislature amended article 798 of the Louisiana Code of Criminal Procedure to provide, in pertinent part, that
It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
* * * * * *
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it unmistakably clear (a) that he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him, or (b) that his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt;

* * * * * *
Moreover, the United States Supreme Court has indicated clearly that a venireman "irrevocably committed" to vote against the death penalty regardless of the evidence presented in the case may be challenged by the state. See Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).
In the present case, each of the seven prospective jurors challenged by the state indicated an unequivocal opposition to the death penalty, so strong that each indicated that he or she would not impose the ultimate penalty under any circumstances. Therefore, the exclusion of these prospective jurors was proper under our statutory law and under the holdings of the High Court.
Accordingly, this assignment of error lacks merit.

ASSIGNMENTS OF ERROR NUMBERS THREE AND FOUR
By these assignments of error, the defendant asserts that the trial judge, in accordance with La.C.Cr.P. art. 401, excluded from service all prospective jurors who had not been parish residents for more than one year and all prospective jurors who had been convicted of a felony for which they had not been pardoned. The defendant contends that these actions denied him of a jury which was representative of a cross-section of the community.
We need not address the constitutional question defendant seeks to raise or consider these assignments at great length. The record reflects that none of the jurors was disqualified because he or she lacked in residency or had been convicted of a felony.
Therefore, these assignments of error lack merit.

ASSIGNMENTS OF ERROR NUMBERS FIVE AND NINE
By these assignments of error, the defendant contends that the trial court erred in giving the following jury instruction requested by the state:

*1240 I further instruct you that any mental disorder short of legal insanity, that is, inability to distinguish between right and wrong cannot serve to negate specific intent and reduce the degree of the crime.
The charge given is a correct statement of our law relative to the defense of insanity. State v. Jones, 359 So.2d 95 (La. 1978). In Louisiana, to be exempted from criminal responsibility on grounds of insanity, the defendant must persuade the jury that he had a mental disease or defect which rendered him incapable of distinguishing right from wrong with reference to the conduct in question. La.R.S. 14:14; State v. Roy, 395 So.2d 664 (La.1981); See generally, Note, The Insanity Defense in Louisiana: Presumptions, Burden of Proof, and Appellate Review, 42 La.L.Rev. 1166 (1982).
Defendant further contends that the charge, by noting that nothing short of legal insanity would "serve to negate specific intent and reduce the degree of the crime," may have misled the jury into believing that they could not return a verdict of guilty to a lesser included offense. The record reflects, however, that the trial judge correctly instructed the jury on the elements of second degree murder and manslaughter and informed them that each was a responsive verdict in the instant case.
Therefore, these assignments of error lack merit.

ASSIGNMENT OF ERROR NUMBER SIX
By this assignment of error, defendant argues that the trial court erred when it refused to give the following special jury instruction:
There has been some testimony in this case to the effect that the Defendant has a mental age of eight years. Our state statute La.R.S. 14:13 provides that "Those who have not reached the age of ten years are exempt from criminal responsibility." You are cautioned that the statute refers to chronological age. However, the fact and purpose of the statute may be taken into consideration in your deliberations.
The criminal defendant in Louisiana has the right to submit to the court special written charges for the jury. La.C.Cr.P. art. 807. The judge must give the requested instruction if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. La.C.Cr.P. art. 807.
The trial judge was justified in refusing to give the requested charge because it was not wholly correct or pertinent. Persons below the age of ten years are exempt from criminal responsibility. La.C.Cr.P. art. 13. When the instant offense occurred, Defendant Welcome was twenty-eight years old. Because the statute refers to chronological age, and not mental capacity, it would have been incorrect to instruct the jury that it may consider the defendant's mental retardation as a possible grounds for finding him exempt from criminal responsibility.
Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVEN
By this assignment of error, defendant argues that the trial judge erred in denying his challenge for cause of a prospective juror, Mr. Herbert.
During the voir dire of Mr. Hebert, the following colloquy took place:
[By Defense Counsel]: Q. Now, did I understand you correctly, in an earlier question, that if there is a question of insanity, and there is a belief that the person was insane at the time he committed the offense, did I understand you correctly to say that unless you were assured he would be put away for a long time, that you could not render a verdict of not guilty by reason of insanity?
[By the Prospective Juror]: A. I'm not sure I understand the question you just *1241 gave. I mean, in accordance to what his question was.
[By Defense Counsel]: Q. If there is testimony as to the insanity, and you are unableand that is the evidence in the case, can you render a verdict of not guilty by reason of insanity in the case?
[By the Prospective Juror]: A. No, sir, I couldn't.
[By Defense Counsel]: Your Honor, I'd move to remove this witness for cause.
BY THE COURT: And the cause being?
[By Defense Counsel]: He is unable to render a verdict of not guilty by reason of insanity. He just testified.
BY THE COURT: Q. What is your name, sir?
[By the Prospective Juror]: A. Drew Hebert.
BY THE COURT: Q. Mr. Hebert, you understand that it is the law of this State that a person who at the time of the commission of the offense is operating under such an illness or defect of his mind that he cannot form the specific intent, and cannot judge right from wrong, that person is not held responsible for the acts as a normal person would be? You understand that?
[By the Prospective Juror]: A. Yes, sir.
BY THE COURT: Q. That is the law. If it were proven to you by competent evidence, in open court, that such a state of facts existed at the time of the commission of the offense, could you, and would you consider rendering a verdict that the defendant was not guilty by reason of insanity?
[By the Prospective Juror]: A. Yes, sir.
BY THE COURT: Q. You could do that?
[By the Prospective Juror]: A. Yes, sir.
BY THE COURT: If the Court instructed you that that's the law?
[By the Prospective Juror]: Yes, sir.
BY THE COURT: The challenge for cause is denied.
The defendant's attorney objected to the ruling.
A criminal defendant in Louisiana is guaranteed a right to full voir dire examination of prospective jurors. La.Const. 1974, art. I § 17. State v. David, 425 So.2d 1241 (La.1983). Our law provides an accused the right to challenge prospective jurors for cause on certain grounds, including the juror's lack of impartiality and the indication by the juror that he will not accept the law as given to him by the court. La.C.Cr.P. art. 797 (2) and (4).
A trial judge is vested with broad discretion in ruling on challenges for cause, and only where it appears, upon review of the voir dire examination as a whole, that the judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused, will this court reverse the ruling of the trial judge. State v. Passman, 345 So.2d 874 (La.1977); State v. Weathers, 320 So.2d 895 (La.1975); State v. O'Connor, 320 So.2d 188 (La.1975); State v. Frazier, 283 So.2d 261 (La.1978); State v. Willis, 262 La.636, 264 So.2d 590 (1972), Cf. State v. Claiborne, 397 So.2d 486 (La.1981).
A trial judge's refusal to excuse a prospective juror for cause is not an abuse of his discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. State v. Passman, supra; State v. Governor, 331 So.2d 443 (La.1976); State v. Nix, 327 So.2d 301 (La. 1976); State v. Johnson, 324 So.2d 349 (La.1976).
The transcript of the voir dire in the present case indicates that the trial judge did not misuse his discretion. The line of questioning by the defendant's counsel of Mr. Hebert was somewhat confusing as clearly indicated by the juror's response that he did not understand the question. But, when the court inquired of the juror whether he could apply the law of this state relative to the defense of insanity the juror unequivocably responded in the affirmative. *1242 Thus, he demonstrated a willingness and ability to decide the case impartially, according to the law and the evidence.
Therefore, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER EIGHT
By this assignment of error, the defense argues that the trial court erred in sustaining several of the prosecuting attorney's objections to questions asked or proposed to be asked by the defense attorney to elicit from witness evidence of the violent character of the victims.
The first ruling occurred during the defense attorney's cross examination of a state witness, Kenneth Robertson, the defendant's nephew:
* * * * * *
[By Defense Counsel]: Q. Had you ever observed Wallace Maturin fighting, or aggressive in any respect?
[By the Witness]: A. Yes.
[By Defense Counsel]: Q. You had? Would you describe it.
[By Prosecuting Attorney]: I'm going to object. There's no evidence of an overt act in this case.
BY THE COURT: Sustained.
[By Defense Counsel]: Q. Had you ever seen Wallace and Dorothy fighting?
[By the Witness]: A. Yes.
[By Prosecuting Attorney]: Objection. That's got nothing to do with the case.
BY THE COURT: Well, the witness has already answered the question.
[By Prosecuting Attorney]: I know.
BY THE COURT: Mr. Burke. Through no fault of your own, but the witness has already answered it. Would you wait one moment, Mr. Landry, before you proceed, and let the train pass.
[By Defense Counsel]: All right, sir.
* * * * * *
[By Defense Counsel]: Q. Now, based on your general knowledge of Herbert and Wallace, if you really don't know who would have gone after who first, just on your basic knowledge of the two people, their character and everything, who would you say would be more inclined to strike first?
[By Prosecuting Attorney]: Objection. Speculation.
BY THE COURT: Sustained.
* * * * * *
[By Defense Counsel]: Q. Have you ever seen Wallace Maturin in fights?
[By the Witness]: A. Him and Dorothy.
[By Defense Counsel]: Q. Fighting each other?
[By the Witness]: A. Yes.
[By Defense Counsel]: Q. How many times?
[By the Witness]: A. Several times.
[By Defense Counsel]: Q. Where did you see this?
[By Prosecuting Attorney]: Your Honor, I'm going to object again. We're getting afield from August the twenty-first, nineteen eighty-one.
BY THE COURT: I'll sustain the objection.
* * * * * *
[By Defense Counsel]: Q. To your knowledge, had Dorothy Guillory ever been accused of stabbing someone?
[By the Witness]: A. Yes.
[By Prosecuting Attorney]: I have to object again. No overt acts on the part of
BY THE COURT: Sustained.
[By Defense Counsel]: Your Honor, I would again state that Dorothy Guillory had an overt action. She had been hitting him over the head with a heavy weighted purse, and there was overt action on her part, and I would strongly object to an appeal to the Court to allow me to pursue this line of testimony.
BY THE COURT: I will make a more complete ruling at a subsequent time outside the presence of the jury. For the present time, it suffices that the Court will sustain the objection.
* * * * * *
*1243 Another ruling occurred during the defense attorney's direct examination of defense witness, Paul Andrew, the defendant's brother:
[By Defense Counsel]: Q. Have you ever observed Wallace [Maturin] or Dorothy Guillory [, the two victims,] fighting?
[By the Witness]: A. Yeah, I remember they had some fights between amongst theirself. Amongst themself. Yes.
[By Prosecuting Attorney]: I'm going to object to any further questions about domestic disputes between the two deceased, unless he can make it more relevant.
[By Defense Counsel]: Your Honor, may I approach the bench?
* * * * * *
BY THE COURT: I'll sustain the objection.
[By Defense Counsel]: Q. Mr. Andrew, to your knowledge, was Wallace prone or liable to get into fights?
[By Prosecuting Attorney]: Objection, that's an opinion of the witness.
BY THE COURT: Sustained.
During examination of these and other witnesses, however, the defense attorney was permitted to develop substantial evidence of the victims' propensities for violence. Many of the prosecuting attorney's objections came after the witnesses had already told the jury that Maturin and Guillory had engaged in fights and that Guillory had been accused of a stabbing. One witness testified in some detail that he had observed the victims on several occasions fighting in their front yard. A nephew of the defendant confirmed during cross-examination the fact that the victims were known to fight. A police officer testified that he had been called to a certain address because of a disturbance between Mrs. Guillory and Mr. Maturin, and that he had arrested Mr. Maturin who was intoxicated and refused to leave the premises. A niece of the deceased Mrs. Guillory testified that although she was a fine lady, she got angry quickly and had been in a couple of fights. Another neice of Mrs. Guillory testified that she had visited her aunt in jail and had seen Mrs. Guillory and Mr. Maturin fighting on several occasions. The latter neice also testified that she had seen Mr. Maturin with two different guns in his possession before the killing, that the defendant knew that Maturin had a gun, and that Mrs. Guillory had two guns which she had carried in her purse and her pocket. A nephew of the defendant testified that Dorothy Guillory had once been accused of a stabbing. A psychiatrist called as an expert witness by the defense testified that the defendant, in relating his history in connection with an examination by the doctor, stated that Mr. Maturin had abused him by withholding part of his wages, cursing him, and making him stay late at work. A second police officer testified that he also was called by Mrs. Guillory to remove an unidentified man from her residence and that she was intoxicated at that time. It was also shown at trial that the victim, Wallace Maturin, had on one occasion turned his dog upon the defendant, Welcome, and that the dog had bitten Welcome. Additionally, the defense attorney in the presence and earshot of the jury referred to "thirteen police assignment sheets dealing with Wallace Maturin and Dorothy Guillory, in disturbances, problems, et cetera, on which the police were called."
The record does not contain a proffer of the evidence which the defense contends was excluded because the trial court sustained the prosecuting attorney's objections. The defense brief does not inform us of the nature of the evidence either. However, from the form of the questions asked and the nature of the evidence that defense counsel successfully introduced, the evidence excluded apparently consisted of further details about fights between Mr. Maturin and Mrs. Guillory, one witness's opinion that Mr. Maturin was prone to get into fights and details of an accusation of violence by Mrs. Guillory. In view of the substantial undisputed evidence of the victims' frequent fights and habits of carrying firearms, introduced either without protest *1244 or over the prosecution's objections, the evidence excluded was purely cumulative and would have added nothing to the probative force of the considerable evidence of the victims' violent characters presented to the jury. Since it is clear beyond a reasonable doubt that any error in the trial court's ruling did not contribute to the defendant's conviction, we conclude that this assignment of error is without merit. See State v. Gibson, 391 So.2d 421 (La.1980). See also, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

ASSIGNMENT OF ERROR NUMBER TEN
By this assignment of error, defendant contends that the trial judge committed reversible error when he allowed the prosecutor to make the following closing argument during the guilt determination phase of defendant's trial:
You have only to answer a simple question. Should this defendant be held responsible for the killing of an unarmed and fleeing crippled man, and for the killing of an unarmed fleeing woman, all within the same time, and within the space of very few feet. My answer to you is, of course he must be held accountable. If we're going to have law in this State, he's got to be held accountable. And you can do that by returning verdicts of guilty as charged on both counts. And I thank you.
There was nothing wrong with the prosecuting attorney's argument. It was confined to evidence admitted, to conclusions of fact that the state may draw therefrom, and to the law applicable to the case. See La.C.Cr.P. art. 774. The argument did not appeal to prejudice. See La.C.Cr.P. art. 774. Since the argument was in no way improper, there was no basis for an admonition or a mistrial. See, La.C.Cr.P. art. 774, Comment C; La.C.Cr.P. arts. 770 and 771; State v. Morris, 404 So.2d 1186, 1191 (La.1981).
Accordingly, this assignment of error lacks merit.

CAPITAL SENTENCE REVIEW
Every sentence of death imposed in this state is reviewed by this court to determine if it is constitutionally excessive. In making this examination, this court determines whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La.S.Ct. Rule 28. See generally, Note, Capital Sentencing Review Under Supreme Court Rule 28, 42 La.L.Rev. 1100 (1982).
A. Aggravating Circumstances
In the instant case, the jury recommended the penalty of death based on its finding of the existence of two aggravating circumstances: (1) the offender knowingly created a risk of death or great bodily harm to more than one person; and (2) the offense was committed in an especially heinous, atrocious, or cruel manner.
Under our law, a sentence of death may not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed. La.C.Cr.P. art. 905.3. The jury may consider as one such statutory aggravating circumstance that "the offender knowingly created a risk of death or great bodily harm to more than one person." La.C.Cr.P. art. 905.4(d). As will be explained more fully below, our cases establish that this aggravating circumstance is present in a case, when the defendant through his act of homicide creates a genuine risk of death or great bodily harm to more than one person or when the defendant through a single consecutive course of conduct contemplates and causes the death of more than one person.
In State v. English, 367 So.2d 815 (La. 1979), this court recognized that the statutory *1245 definition of this aggravating circumstance might be restricted to circumstances under which the defendant's act of homicide also created a grave danger to persons other than the victim, such as when a bomb is exploded in a crowded building. However, we declared that the more probable legislative intent was that the penalty of death may be justified when a "single consecutive course of conduct contemplates and causes the risk of death or great bodily harm to more than one person...." Id. at 824.
We have applied the English construction in several subsequent cases. In State v. Martin, 376 So.2d 300 (La.1979), this court upheld the finding of the aggravating circumstance when the offender entered a house trailer and killed all four of its occupants in rapid succession. Likewise, in State v. Sonnier, 379 So.2d 1336 (La.1980) (original hearing), this court held that the aggravating circumstance was properly found in a case "where the offender kill[ed] two or more persons during a single consecutive course of conduct for the purpose of preventing any one of those killed from disclosing the murder of the other ...." Id. at 1362.
These decisions indicate that one of two factors must be present to satisfy the requirements for the aggravating circumstance: Either a single act of homicide by an offender must create a genuine risk of death or great bodily injury to more than one person, such as the risk created by the explosion of a bomb in a crowded building; or, a single consecutive course of conduct by the offender must contemplate and actually cause the death of one person and the death or great bodily harm of another, such as the slaying of four persons in close proximity and in rapid succession inside a house trailer.
Applying these precepts to the instant case, we conclude that the jury's finding beyond a reasonable doubt of the aggravating circumstance, "the offender knowingly created a risk of death or great bodily harm to more than one person," was adequately supported by the evidence in the instant case. Defendant Welcome engaged in a scuffle with both victims. As he struggled with Maturin, Guillory repeatedly struck him with her purse. After regaining his pistol, defendant fired three shots at Maturin. When Maturin fled to the side of the house, defendant followed him and fired several more shots into him, resulting in his death. Defendant paused only long enough to reload his gun, during which he told Guillory that she was next. He then pursued her down a nearby street, and killed her with several shots. The entire episode occurred in a matter of some thirty or forty seconds. Thus, the series of facts which led to the two deaths was a single episode, a single consecutive course of conduct, which arose out of and closely followed his altercation with Guillory and Maturin. Consequently, it was reasonable for the jury to find beyond a reasonable doubt that the defendant contemplated and caused the death of the two victims in a single consecutive course of conduct.
However, the defendant argues that the second aggravating circumstance found, namely that the "offense was committed in an especially heinous, atrocious, or cruel manner," is not supported in the evidence. The defendant correctly notes that the state did not present evidence or argue in support of this aggravating circumstance.
This court has taken the position that where more than one statutory aggravating circumstance is found by the jury, the failure of the one circumstance does not so taint the proceedings as to invalidate any other aggravating circumstance found and the sentence of death based thereon. State v. James, 431 So.2d 399 (La.1983); State v. Sonnier, 402 So.2d 650 (La.1981); State v. Monroe, 397 So.2d 1258 (La.1981); But see, Note, Capital Sentencing Review Under Supreme Court Rule 28, 42 La.L. Rev. 1100, 1112 (1982). Therefore, since the jury's finding that the defendant knowingly created a risk of death or great bodily harm is clearly supported by the evidence, it is not necessary that we consider the merit of defendant's argument on the other aggravating circumstance.
*1246 B. Passion, Prejudice or Arbitrariness
Defendant has made several assignments of error in which he contends that the death penalty is tainted because an arbitrary factor was interjected into the proceedings.

ASSIGNMENTS OF ERROR NUMBERS ELEVEN AND TWELVE
By these assignments of error, the defendant contends that the prosecutor's arguments during the penalty phase introduced an arbitrary factor which invalidated the capital sentence returned by the jury. Specifically, the defendant contends that the trial court erred when it allowed the prosecutor to argue the supposed deterrent effect of capital punishment and when it permitted the state to refer to the jury as "part of the machinery of the criminal justice of the State of Louisiana."
This court carefully reviews the arguments of the state made during the penalty phase of a capital case. A prosecutor may not call upon the jury to base its decision upon a consideration outside the scope of its authority or refer to facts upon which no evidence has been introduced. State v. Willie, 410 So.2d 1019 (La.1982). Nor may the prosecutor convey a message which in some way lessens the jury's awesome responsibility in a capital trial. State v. Willie, supra. See also, State v. Monroe, 397 So.2d 1258 (La.1981).
The record in the present case reflects that the prosecuting attorney was not only a competent advocate for the state but also that he was a fair opponent and did not appeal to passion or prejudice in order to obtain the sentence of death. His brief reference to the possible deterrent effect of the death penalty did not induce the jury to skew their focus from the particular defendant and offense in the instant case. See State v. Willie, supra. See also State v. Narcisse, 426 So.2d 118 (La.1983) (where we held that the state's brief reference to the alleged deterrent effect of the death penalty did not inject an arbitrarry factor into the proceedings which might have tainted the verdict). The prosecutor's reference to the jury as "part of the machinery of the criminal justice [system]" was in fact an accurate depiction. Moreover, this remark could not have lessened in the jurors' minds their awesome responsibility. Compare this remark with those at issue in State v. Willie, supra, (continuous references of the state to the numerous appeals available to the defendant improperly suggested to the jurors that their imposition of the death penalty would not be final).
Accordingly, these assignments are without merit.

ASSIGNMENTS OF ERROR NUMBERS THIRTEEN AND FOURTEEN
By these assignments of error, defendant contends that the trial judge erred in instructing the jury that it need only find one aggravating factor beyond a reasonable doubt and only had to consider the mitigating factors in order to recommend the imposition of the death penalty. Defendant argues that the jury should have been instructed that it must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors before it may impose the death penalty.
Defendant's arguments suggest a misunderstanding of our capital sentencing scheme. After a verdict of guilty to first degree murder, a sentencing hearing is conducted. La.C.Cr.P. art. 905 et seq. The sentence will be life imprisonment unless the jury finds unanimously and beyond a reasonable doubt at least one statutorily defined "aggravating circumstance." La. C.Cr.P. art. 905.3. However, having found the existence of a statutory aggravating circumstance the jury is still not required to impose the death penalty. State v. David, 425 So.2d 1241 (La.1983); State v. Watson, 423 So.2d 1130 (La.1982). Instead, it is merely authorized to impose the ultimate penalty after considering evidence of any mitigating circumstances. La.C. Cr.P. art. 905.3. Unless the jury unanimously determines that the death penalty should be imposed, the defendant will be *1247 sentenced to life imprisonment without parole, probation, or suspension of sentence.
The proceedings in the instant case were conducted in accordance with this statutory scheme. The trial judge therefore did not introduce an arbitrary factor into the proceedings by complying with the law.
We note further that the record does not indicate that the death penalty was imposed arbitrarily or out of local passion or prejudice. Defendant is a black man and one of his victims was white. However, nothing in the record suggests that racial prejudice was a factor in imposing the sentence of death. Members of the defendant's race were represented on the jury which recommended the death penalty.
C. Proportionality
Defendant, Herbert Welcome, was twenty-eight years old at the time of the instant murder. He is one of six children. Defendant's parents are both deceased. His father died in 1979; his mother, in 1982, after the instant offense occurred.
Defendant completed only three years in school. He attended some night classes for over a year after dropping out of grade school. He has no other formal education. The sanity commission found the defendant to be mildly to moderately retarded. A psychiatrist for the state testified at the sanity hearing that defendant was shy and withdrawn, but that he had legal capacity and was able to distinguish between right and wrong. One psychiatrist, a witness for the defense, testified at trial that defendant had a mental age of eight years.
Defendant has a substantial employment history. The record indicates that the defendant has held jobs for extended periods of time with the same employers. Defendant was employed as an automobile body worker at the time of the instant offense. Previously, he had been employed as an oil field laborer for four years, a field laborer for two years, and a janitor for about six months. Defendant served briefly in the National Guard, but was discharged in a matter of months for psychiatric reasons.
Defendant has a fairly substantial criminal record, stretching back to 1973. Most of his offenses are property offenses. However, the record reflects that defendant was involved in two crimes against the person, an aggravated assault and a simple battery.
Defendant is not married and has no dependents.
Of all first degree murder prosecutions in Iberia Parish since 1976, three have resulted in the death penalty. One of these sentences was vacated because it was found to be excessive. State v. Eddie Sonnier, 380 So.2d 1 (1979). Another was remanded for a new sentencing proceeding and the death penalty was reimposed and affirmed on the second appeal. State v. Elmo Sonnier, 402 So.2d 650 (1981). The third case is the present one.
A comparison of the sentence in this case to sentences in other first degree murder prosecutions in Iberia Parish shows that it is not a disproportionate sentence. The instant offenses were committed in a particularly senseless fashion. The altercation which led to the deaths of the two victims began with an argument over a pocketknife. Defendant fired his gun numerous times at point blank range into the first victim, Maturin. He then pursued the second victim, Guillory, down the street and brutally murdered her despite her cries for mercy. Defendant has a history of criminal activity, including two previous instances involving the use of dangerous weapons.
There are some first degree murder cases from Iberia Parish in which the death penalty was either not imposed by the jury or not upheld by this court. However, in those cases, the defendants either killed only one person or were able to prove mitigating circumstances not present in the instant case. See, e.g., State v. Eddie Sonnier, 380 So.2d 1 (1979).
Accordingly, we affirm defendant's conviction and sentence of death.
AFFIRMED.
*1248 LEMMON, J., concurs.
BLANCHE, J., concurs and assigns reasons.
BLANCHE, Justice (concurring).
I concur in the result but disagree with the majority position that where one aggravating circumstance is proved beyond a reasonable doubt, it is unnecessary to consider any allegations of error with respect to the jury's finding of any other aggravating circumstances. Under Supreme Court Rule 28, § 1(a) this court is charged with reviewing the jury's recommendation of death to determine if that recommendation was influenced by passion, prejudice, or any other arbitrary factors. Consequently, any error with respect to the jury's finding of an aggravating circumstance must be scrutinized according to whether such finding introduced an element of arbitrariness and capriciousness into the jury's recommendation of death so as to render that sentence constitutionally impermissible. Such a consideration necessarily requires an initial determination of whether the aggravating circumstances found by the jury are supported by the evidence.
In the present case, the jury found two aggravating circumstances: (1) the offender knowingly created a risk of death or great bodily harm to more than one person; and (2) the offense was committed in an especially heinous, atrocious, or cruel manner.
As the majority correctly concludes, the jury's finding of the first aggravating circumstancethat "the offender knowingly created a risk of death or great bodily harm to more than one person"is adequately supported by the evidence. However, the jury's conclusion that the offense was committed in an "especially heinous, atrocious or cruel manner" is not so easily supportable. Under the jurisprudence, in order to find that the offense was committed in an "especially heinous, atrocious or cruel manner" there must have been some degree of "torture or pitiless infliction of unnecessary pain on the victim." State v. Sonnier, 379 So.2d 1336 (La.1979 (on original hearing)); State v. English, 367 So.2d 815 (La.1979). Generally, physical abuse of the victim is necessary, with death being brought about in a "particularly painful and inhuman manner." State v. Moore, 432 So.2d 209 (La.1983); State v. Baldwin, 388 So.2d 664 (La.1980). In the present case, although we can infer that the victim was subjected to a great deal of fear and anguish prior to her death, there is no evidence that the killing was committed in the especially cruel manner contemplated by La.C.Cr.P. art. 905.4(g) and the jurisprudential interpretation thereof. The jury clearly erred in finding this aggravating circumstance. Pursuant to Supreme Court Rule 28, § 1(a) we must determine whether, as a result of that error, the defendant's death sentence was imposed under the influence of an arbitrary factor.
It is this writer's opinion that the jury's return of the unsupported aggravating factor did not interject an arbitrary element into the jury's recommendation of the death penalty. In the present case, the finding of the jury that the offense was committed in an "especially heinous, atrocious or cruel manner" was based solely on evidence adduced at trial and was not based on an attempt by the state in the penalty proceeding to prove that this aggravating circumstance actually existed. Since there was introduced no evidence in support of this unproved aggravating circumstance and no argument furthered in its support, there existed no arbitrary factor which may have incited the passion of the jury, prejudiced the defendant, or weighed unfairly in the jury's deliberations.
Accordingly, I concur in the affirmance of defendant's conviction and sentence.

ON REHEARING
LEMMON, Justice.
We granted a rehearing to consider the role of the proportionality review provided by Supreme Court Rule XXVIII § 1(c), as part of the review for excessiveness legislatively required by La.C.Cr.P. Art. 905.9, in the overall Louisiana capital sentencing *1249 system and in its particular applicability in this case.[1] We now reinstate our original decree, which affirmed defendant's conviction of first degree murder and sentence of death, for five principal reasons: (1) there is no federal constitutional requirement that a state capital sentencing system include a comparison by the appellate court of the death sentence in the particular case under review with the penalties in similar cases, as long as the overall system provides adequate protection against the arbitrary imposition of the death penalty; (2) Louisiana's overall capital sentencing system contains adequate safeguards to insure against the arbitrary imposition of capital punishment, even without the proportionality review required by court rule; (3) a review of the entire record, and particularly of the aggravating and mitigating circumstances, does not indicate that the jury exercised its sentencing discretion capriciously or under the influence of arbitrary factors; (4) the sentence imposed in this case is not disproportionate to the sentences imposed by juries in other first degree murder convictions in the judicial district; and (5) a review of the penalties imposed by juries in first degree murder cases in Louisiana since the present capital sentencing scheme was initially enacted in 1976 reveals that Louisiana juries have generally recommended the death penalty when the offender actually killed more than one person in a single act or in a single consecutive course of conduct.

I.
The Supreme Court of the United States in Pulley v. Harris, ___ U.S. ___, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), held that the Eighth Amendment does not necessarily require a capital sentencing system to include a provision for the appellate court to compare the sentence in the case under review with the penalties imposed in similar cases. The principal constitutional consideration is that the overall system contain sufficient checks and safeguards against the arbitrary imposition of capital punishment.
Thus, while some sort of proportionality review is desirable (and is arguably necessary to maintain the constitutionality of some capital sentencing schemes) as part of an automatic appellate review, the exact role of proportionality review varies from state to state in relation to the variations in the overall capital sentencing scheme of the particular state. Before discussing the role of proportionality review under the present Louisiana statute, we first undertake a general review of the recent pertinent death penalty decisions by the Supreme Court and a particular review of the recent Harris decision.
In 1972 the Supreme Court, upon reviewing death sentences imposed under the capital sentencing statutes of two states, issued a per curiam opinion holding that the imposition and carrying out of the death penalty in the cases under review constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. See Furman v. Georgia, Jackson v. Georgia, and Branch v. Texas, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Five justices filed separate opinions supporting the decision, and four justices filed separate dissenting opinions. The concurring justices were particularly concerned about imposition of the death penalty arbitrarily, discriminatorily, or in a wanton or freakish manner.
*1250 Most of the states with capital punishment laws thereafter enacted new statutes which were designed to avoid arbitrary results. To achieve this purpose, the new statutes generally included provisions for a bifurcated sentencing hearing, for clear and objective guidelines for channeling sentencing discretion with focus on the particular offense and the particular offender, and for automatic appellate review.
In 1976 the Court undertook a review of three of the new statutes, each of which provided a separate approach for avoiding arbitrary imposition of capital punishment. The Georgia statute reviewed in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), made the death penalty available for six categories of crimes, including murder (which was defined as causing the death of a human being with malice aforethought). The statute further provided for a separate penalty hearing, for the required finding of at least one (of eight) statutory aggravating circumstances, for a determination of penalty based on consideration of the aggravating and mitigating circumstances, and for expedited appellate review, including tests for arbitrariness and disproportionate excessiveness. The three-judge plurality opinion that announced the decision of the Court primarily emphasized the importance of the bifurcated proceeding, in which the sentencing authority was provided with relevant information, and of the objective standards for guiding the use of that information.[2] Moreover, as the Court later observed in the Harris decision, both that opinion and the other three-judge plurality opinion apparently considered the proportionality review merely as "an additional safeguard against arbitrary or capricious sentencing." ___ U.S. at ___, 104 S.Ct. at 877.
The Florida statute reviewed in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), provided for a bifurcated procedure, for the required presence of at least one (of eight) statutory aggravating circumstances, and for ultimate sentencing authority in the trial judge based on specific and detailed guidelines. Appellate review for comparative proportionality was not expressly required.[3]
The Texas statute reviewed in Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), provided still a different approach to avoiding arbitrary imposition of capital punishment. By means of a narrow definition of capital murder, the scheme required a finding of at least one (of five) statutory aggravating circumstance in the guilt phase before a death sentence may even be considered in the penalty phase.[4] The statute further provided for a separate sentencing hearing, for imposition of the death sentence only upon the jury's affirmatively answering three questions which focused the jury's consideration on the particular offense and the particular offender, and for prompt appellate review, but contained no provision for a comparative proportionality review by the appellate court. As the Court later noted in the Harris decision, the other safeguards in the Texas statute made the proportionality review "constitutionally superfluous."
*1251 Finally, the Harris decision itself observed that the discussions in the earlier cases had not focused on proportionality review as such, but on the requirement of some type of prompt, automatic and meaningful appellate review. The Harris decision further noted that another earlier opinion, Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), had reiterated the importance of mandatory appellate review, but had emphasized the "constitutionally necessary narrowing function of statutory aggravating circumstances". Pulley v. Harris, ___ U.S. at ___, 104 S.Ct. at 899.
Thus, the Supreme Court in Harris, without departing from the rationale of earlier cases, reemphasized that the adequate guiding of sentencing discretion is the principal constitutional requirement for avoiding the arbitrary imposition of capital punishment and upheld the constitutionality of a system which required the sentencing authority to determine the penalty by focusing on the aggravating and mitigating circumstances applicable to the particular offense and the particular offender in a separate penalty phase of the trial, subject to a mandatory appellate review that did not include a provision for comparative proportionality review.

II.
We next proceed to discuss the role of proportionality review in the Louisiana capital sentencing system. We begin by reviewing the post-1972 legislation.
After the 1972 Furman decision, the Louisiana Legislature enacted a new capital sentencing statute, which included a definition of first degree murder as a specific intent killing in the presence of one of five enumerated aggravating elements. Act 109 of 1973 thus narrowed considerably the class of capital murders. However, the death penalty was mandatory for all first degree murder convictions, and the jury had no sentencing discretion (except by returning a responsive verdict of second degree murder). Moreover, because there were no bifurcated proceedings, the defense had virtually no opportunity to present evidence of mitigating circumstances relevant for sentencing consideration. There also was no provision for automatic appeal.
A death sentence under the 1973 statute was invalidated by the Supreme Court in Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), primarily because of the mandatory death penalty feature.[5] In the wake of the Roberts and Gregg decisions, the Legislature adopted Acts 657 and 694 of 1976, which set forth a new capital sentencing procedure that essentially followed the Georgia procedure approved in Gregg.[6] First degree murder *1252 was redefined to encompass all specific intent killings. The aggravating elements were removed as essential elements of the crime, but these and other circumstances were included as considerations for a separate sentencing hearing at which the jury was given the discretion to decide the penalty under specified standards for the exercise of discretion. The new statute also provided an automatic appeal.
The Legislature amended the statutes several times in the period between 1976 and 1979, during which the scheme fluctuated between a broad substantive definition of first degree murder narrowed by aggravating circumstances to be included in the penalty phase and a narrow substantive definition which incorporated aggravating elements as an essential element of the offense.[7] By Act 74 of 1979, the Legislature finally settled upon the requirement of one of four aggravating elements as part of the substantive definition of first degree murder, thus providing a discretion-narrowing feature in the guilt phase similar to the Texas statute approved in Jurek. However, the Legislature also retained the features of the Georgia statute approved in Gregg, thereby implementing a capital sentencing system which provided the best features of both schemes.[8] Under the amended statute with its legislative channeling of discretion in the guilt phase (accomplished by making the death penalty unavailable in most specifically intended killings), the death penalty is an available option for only a small category of murderers.[9] Additionally, in the small remaining class of capital-eligible cases, the jury has total discretion to make a binding recommendation of life imprisonment.
Therefore, the present Louisiana capital sentencing system contains so many safeguards and checks on arbitrariness, in comparison to systems in other states, that a comparative proportionality review clearly is not constitutionally required.[10] Nevertheless, there is a court rule requiring such a review as part of the statutorily mandated appellate review for excessiveness, and we proceed to consider the role of that review in the overall legislative scheme outlined above.
Comparative proportionality review assumes that capital punishment is not disproportionate for the crime of first degree murder.[11]Pulley v. Harris, above. The *1253 question pertinent to comparative proportionality review is whether the penalty in the case under appellate review is disproportionate to the penalty imposed on other persons who committed first degree murder under similar circumstances.
Proportionality review, however, was never intended as a method of achieving "slide-rule" uniformity in the application of the death sentence. The role of proportionality review under the 1976 statute, as originally enacted, was to identify those death eligible cases in which juries recommended the death sentence so infrequently that the recommendation of death in the particular case might be deemed the action of an "aberrant jury".[12] This purpose was clearly stated in the opinion in Gregg:
"The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death." 428 U.S. at 206, 96 S.Ct. at 2940. (Emphasis supplied.)
Because all specifically intended homicides constituted first degree murder under the 1976 statute and all cases of convictions of first degree murder were presented to the jury for sentencing recommendation, there was a significant possibility of an occasional excessive penalty recommendation by an "aberrant jury". However, because La.R.S. 14:30, as amended in 1979, now limits first degree murder to those specifically intended killings which are committed under limited circumstances, there are serious aggravating circumstances present in every case which is submitted to the jury for sentencing recommendation. Therefore, at least as to aggravating circumstances, the role of comparative proportionality review is not nearly as significant in minimizing the risk that an "aberrant jury" may have arbitrarily chosen to recommend the death penalty as it was prior to the 1979 amendment or as it may be in states whose statutory scheme permits the jury to consider the death penalty in a much broader class of cases.[13]
Comparative proportionality review by the appellate court under the present law is still a relevant factor, but the primary focus should be on the jury's consideration of significant mitigating circumstances, particularly those pertaining to the defendant's degree of culpability. The jury's failure to consider significant mitigating circumstances has generally been the basis for setting aside the death penalty on the basis of comparative disproportionality.[14]
*1254 Another consideration is that the Legislature, in requiring appellate review for excessiveness, never intended that the appellate court should substitute its judgment for that of a sentencing jury which has been adequately guided by a properly drafted statute and which has not been affected by discriminatory considerations or arbitrary factors. Under the Louisiana system, the primary function of this court in reviewing the penalty phase of a capital case is not to sit as a subsequent seven-member sentencing panel, but to insure that the jury's sentencing function was not affected or influenced by arbitrary factors. The comparative proportionality review, as part of the overall appellate review for excessiveness, serves largely as a barometer for revealing the effect of any arbitrary factors. In cases (such as the present one) in which no arbitrary factors have been discovered on appellate review and in which the jury's discretion was properly guided by a statute that employs ample safeguards for the introduction and use of relevant information, an appellate court should be extremely hesitant to disturb the jury's decision.[15]

III.
We next turn to an appellate review of the death sentence imposed on this particular offender for this particular offense. An appropriate beginning place is the analysis of how the particular offense (committed in 1981) qualifies as a first degree murder under the narrowed definition of the crime adopted in 1979.
At first blush, this offense might appear to be a "heat of passion" homicide, since defendant killed his own aunt and her friend after an argument and fight at defendant's home where the aunt was visiting defendant's mother. However, the significant time lapse between the initial scuffle and the shooting of the aunt's friend (for which the jury recommended life) clearly qualifies this offense as first degree murder. Furthermore, as to the subsequent shooting of the aunt (for which the jury recommended death), not only was there another significant time lapse between the two shootings, but also there were deliberate and affirmative acts by the offender in threatening the second victim, reloading the gun, chasing that victim down the street, and firing five shots into her while she begged for mercy. Under these circumstances, the second killing also clearly qualifies as first degree murder.[16]
The sentencing recommendations clearly indicate that the jury perceived a distinction *1255 between the two killings. Significantly, the jury recommended life imprisonment for the first murder, in which there were possible mitigating circumstances involving perceived justification and heat of passion. However, the jury recommended the death penalty in the second murder, in which the defendant threatened, chased and calculatedly executed his victim.
Moreover, a review of the entire record for excessiveness indicates that the jury's discretion was properly focused and was exercised reasonably without the influence of arbitrary factors. At least one statutory aggravating circumstance was proved beyond a reasonable doubt, as explained in the opinion on original hearing. The question of race was not a factor both defendant and the victim were black, and the jury included members of their race. There was no suggestion of media influence. The prosecutor made no appeal to passion or prejudice.[17]
Neither can we say that the jury's recommendation was so totally inconsistent with the mitigating circumstances established in the record that the jury must not have considered them. Defense counsel presented evidence to the jury of three mitigating circumstancesthat the offense was committed while defendant was under the influence of mental disturbance, that defendant reasonably believed there was justification for his conduct, and that defendant had no significant prior history of criminal history or criminal activity. The 28-year old defendant was mildly to moderately retarded, but he had functioned satisfactorily at a number of jobs and had a reasonable work history. The contention that defendant reasonably believed extenuating circumstances justified his conduct was certainly considered by the jury, which recommended life imprisonment for the first killing. Although defendant did not have any prior felony convictions, he was no stranger to the criminal justice system and was not a first time abuser of weapons. Of a number of misdemeanor convictions, two involved the carrying of concealed weapons and two involved the use of dangerous weapons.[18]
Additionally, there were no mitigating circumstances relating to defendant's lesser degree of culpability. He was the triggerman and the only perpetrator. After killing the male victim, he chased down the unarmed female victim and fired multiple shots into her as she begged for mercy.
Finally, the comparative review undertaken on original hearing indicates that the death sentence is not disproportionate to the penalties in similar cases within the district. Moreover, although not required to do so by court rule, we have in this case conducted a survey of all reported first degree murder convictions involving multiple killings in Louisiana since 1976.[19] That survey indicates that juries in this state have generally recommended the death penalty when two or more persons were actually killed in a single act or a single consecutive course of conduct. Of the 13 cases surveyed (12 reported and one pending in this court), the jury recommended death in eight cases. Therefore, even without considering the distinctions between the Georgia and Louisiana statutes, we conclude that this case is not an example of "the action of an aberrant jury" *1256 with which the plurality opinion in Gregg was concerned. The survey shows that the jury in this case did not deviate from any pattern established by juries for recommending life imprisonment in this particular type of first degree murder case.
One of the purposes of capital punishment is to incapacitate those particularly dangerous murderers for whom other sanctions may not be adequate. A person who has committed multiple murders may reasonably be considered more likely to murder again and therefore an appropriate candidate for the most severe punishment which offers society the most complete protection from the most dangerous criminals.[20] The jury in the present case, guided by a rational statute with appropriate safeguards and unaffected by arbitrary or discriminatory factors, reasonably concluded that this offender presents such a continuing danger to society that the most severe punishment should be imposed. Other Louisiana juries have generally reached the same conclusion for this type of murderer, and juries in this particular judicial district in the only two cases involving multiple murderers have recommended the death penalty in both. Because we are convinced after reviewing the record that the jury's recommendation was not reached arbitrarily and was not based on improper considerations, we find no basis for concluding that this jury's considered recommendation was "the action of an aberrant jury".
Accordingly, the original judgment affirming the conviction and sentence is reinstated.
DIXON, C.J., and DENNIS, J., dissent with reasons.
CALOGERO, J., dissents for reasons assigned by DENNIS, J.
BLANCHE, J., concurs and assigns reasons.
WATSON, J., concurs in the result and assigns reasons.

APPENDIX A
SURVEY OF REPORTED FIRST DEGREE MURDER CONVICTIONS IN LOUISIANA IN WHICH MORE THAN ONE VICTIM WAS KILLED
1. State v. David Joseph Sylvester, 388 So.2d 1155 (La.1980) Orleans Parish Date of Crime: July 20, 1976
Gunman hired by defendant shot and killed two people who were to be prosecution witnesses in defendant's trial for possession of heroin with intent to distribute. Jury recommended LIFE.
2. State v. Parker, 372 So.2d 1037 (La. 1979)
Orleans Parish Date of Crime: October 1, 1976
In the process of an armed robbery, defendant forced two employees of Popeye's Fried Chicken to kneel on the floor of a large walk-in cooler and shot them both in the head. Jury recommended
DEATH on each of two counts. Supreme Court reversed and remanded, because the trial court had violated the jury sequestration rule.
3. State v. Martin, 376 So.2d 300 (La. 1979)
Lafourche Parish Date of Crime: August, 1977
Defendant's wife told him she had sexual relations with her employer, the owner of a lounge. A few days later, defendant went to the man's home and shot and killed him, as well as the three other people who were present. Four counts of first degree murder; jury recommended DEATH on each count. Supreme Court affirmed.
*1257 4. State v. Elmo Sonnier, 379 So.2d 1336 (La.1980)
Iberia Parish Date of crime: November, 1977
Defendant and younger brother kidnapped young couple, raped girl, killed both. Jury recommended DEATH. Supreme Court reversed on rehearing and remanded for new penalty hearing, holding that jury was incorrectly instructed with regard to defendant's eligibility for work release program. On remand, jury again recommended DEATH. Supreme Court affirmed. 402 So.2d 650 (La.1981). Sonnier has been executed.
5. State v. Eddie Sonnier, 380 So.2d 1 (La.1979)
Iberia Parish Date of Crime: November, 1977
Same facts as Elmo Sonnier. Jury recommended DEATH. Supreme Court reversed and ordered imposition of life sentence, holding that defendant, a first offender, played a subsidiary role in the killing to that of his domineering older brother, who had just been released from the penitentiary and killed the couple to avoid another prison term.
6. State v. Oliver, 387 So.2d 1154 (La. 1980)
Caddo Parish Date of Crime: January 17, 1978
Defendant and friend killed their associate in drug activity and his associate's friend. Defendant's friend pleaded guilty to second degree murder and was sentenced to life. After conviction, jury could not unanimously agree on sentence, so court imposed LIFE. Supreme Court reversed and remanded. The indictment was then amended to charge second degree murder, and defendant was convicted and sentenced to life.

State v. Giovanni, 409 So.2d 593 (La. 1982)
Calcasieu Parish Date of Crime: September 2, 1978
In what appeared to be a drug-related incident, defendant shot three victims (a young family) and then burned down their house with the bodies inside. Jury recommended LIFE on each of three counts. Supreme Court affirmed.
8. State v. Francis, 403 So.2d 680 (La. 1981)
Lafayette Parish Date of Crime: April 18, 1979
Defendant shot and killed two men at the Tip Top Club in Broussard. Jury recommended LIFE on each of two counts. Supreme Court affirmed.
9. State v. Alvin Sylvester, 400 So.2d 640 (La.1981)
Calcasieu Parish Date of Crime: July 16, 1979
After being ejected from a lounge for fighting, defendant removed a rifle from his car and shot and killed two people who had been involved in the fight. Jury recommended DEATH on each of two counts. Supreme Court reversed and remanded based on trial judge's denial of defendant's challenges for cause of two jurors and the judge's denial of defendant's motion for mistrial.
10. State v. Tonubbee, 420 So.2d 126 (La. 1982)
St. Charles Parish Date of Crime: April 19, 1980
Defendant intentionally struck and killed two people on highway with his car. Jury recommended LIFE on each of two counts. Supreme Court affirmed.
11. State v. Welcome, 458 So.2d 1235 (La. 1984)
Iberia Parish Date of Crime: August 21, 1981
Instant case.
12. State v. Glass, 455 So.2d 659 (La.1984)
Webster Parish Date of Crime: December 25, 1982
Glass and codefendant Wingo escaped from the Webster Parish jail, broke into the home of a married couple in their late 50's, tied the victims in their bed, killed them by shooting them in the head, and stole the victims' automobile. Jury recommended DEATH on each of two counts. Supreme court affirmed.

*1258 [*]13. State v. Wingo, No. 84-KA-0260
Webster Parish Date of Crime: December 25, 1982
Same facts as Glass. Jury recommended DEATH on each of two counts.
BLANCHE, Justice (concurring).
Herbert Welcome was mentally retarded. He was described by one psychiatrist as having a mental age of 8 years. The sanity commission found him to be mildly to moderately retarded. There is no evidence that the defendant, despite his retardation, was unable because of any mental defect, to distinguish between right and wrong at the time of the commission of the offense. It is fair to state that both killings were intended and motivated by defendant's rage after an altercation with both victims. The jury distinguished the two killings and only assessed the death penalty against the defendant for the murder of his aunt whom he threatened while reloading his pistol; chased down a street and executed.
The evidence supported the finding by the jury of an aggravating circumstance as the basis for the imposition of the death penalty. The jury was also aware of the mitigating circumstances surrounding the commission of the crime.
When the crime of first degree murder has been proved beyond a reasonable doubt and the jury within its discretion has imposed the death penalty after considering all of the sentencing guidelines, on review we should approve the sentence.
The nature of the system, in which defendants with varying characteristics commit crimes under different circumstances and conditions, are judged by juries composed of citizens possessing different degrees and levels of compassion and understanding, and are prosecuted or defended by lawyers with varying degrees of competence, does not contemplate uniformity in result.
That another jury in a factually similar case may not have imposed the death penalty should not on the basis of proportionality be of any avail to Herbert Welcome if he had a fair trial resulting in his conviction and sentence absent any arbitrary factors.
My own review of the record convinces me that the defendant received a fair trial and that the jury's verdict was not an arbitrary imposition of the death penalty.
I therefore also concur for the foregoing reasons.
WATSON, Justice, concurring in the result.
My vote to grant a rehearing in this case was based on concern as to whether defendant and his crime fell into the category of homicides which by their nature deserve capital punishment. Some features of the case: the kinship between the defendant and one of the victims, the apparent absence of any planning prior to the tragic events, the argument and killings in what seemed to be a fit of rage; suggested that the defendant committed two manslaughters instead of two first degree murders. After further study and reflection, I have concluded that the punishment recommended by the jury is appropriate to the defendant and the crime, although I harbor some reservations.
With due respect to my colleague, the author of the majority opinion on rehearing, I agree with other members of the court who have expressed their thought that much of the discussion of proportionality is irrelevant.
Therefore, I will concur only in the result.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
What is discussed in the majority opinion concerning United States Constitutional requirements and proportionality review is wholly irrelevant to the issue in this case. I further dissent because the opinion does not treat the issue for which the rehearing was granted, that is, whether the death *1259 sentence is appropriate for this mental retardate.
DENNIS, Justice, dissenting.
I respectfully dissent.
After writing the majority opinion on original hearing, I agreed to vote for a rehearing when a substantial number of my brethren expressed concerns that Welcome's mental retardation either makes capital punishment disproportionate under the circumstances of this case or that Welcome's deficiency prevented him from having the mental capacity to knowingly create a risk of death or great bodily harm to more than one person. The plurality opinion on rehearing reflects little, if any, fresh consideration of these problems. Instead the plurality reaches out to discuss issues not before this court, and in doing so reaches several incorrect or highly debatable conclusions. Although the plurality opinion does not express the majority view of this court and therefore cannot be relied upon as precedent, there are several other reasons that it should not be considered persuasive.
First, it is useless and injudicious for this court to debate whether comparative proportionality review is required by the federal constitution in Louisiana. Comparative proportionality review is required in Louisiana by our own constitution, our own statutes, and our own court rules. La.Const. art. I, § 20; La.C.Cr.P. art. 905.9; La.C. Cr.P. art. 905.9.1; La.Sup.Ct.R. XXVIII. This court has recognized repeatedly that whether a sentence is proportionate in terms of the nature of the offense, the propensities of the offender, and other comparable offenders and offenses is necessarily a question to be considered in excessiveness review under our state constitution. State v. Lathers, 444 So.2d 96 (La. 1983); State v. Telsee, 425 So.2d 1251 (La. 1983); State v. Sepulvado, 367 So.2d 762 (La.1979) (See statistical proportionality review at page 772 and statistics in court's unpublished but public appendix). See also, State v. Sims, 410 So.2d 1082 (La. 1982); State v. Johnson, 406 So.2d 569 (La.1981); State v. Kersey, 406 So.2d 555 (La.1981); State v. Snider, 406 So.2d 209 (La.1981); State v. Williams, 397 So.2d 1287 (La.1981); State v. Bonanno, 384 So.2d 355 (La.1980). This court is required by law to review every sentence of death to determine if it is excessive, and it is mandated by law to establish procedures by rules necessary to satisfy constitutional criteria for review. La.C.Cr.P. art. 905.9. In compliance with its constitutional and statutory duty, this court adopted rules for capital sentence review. In pertinent part, these rules provide that "[e]very sentence of death shall be reviewed by this court to determine if it is excessive" and "[i]n determining whether the sentence is excessive the court shall determine ... whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." La.C. Cr.P. art. 905.9.1 (emphasis added).
Second, the question of whether proportionality review is required in Louisiana by federal constitutional law was not put at issue or argued by the parties in this case. Therefore, the majority's discussion of the question is premature, obiter dictum. Moreover, even if our constitution, laws and court rules were changed to put the matter at issue in a future case, it still would be subject to debate whether the federal constitution would require it in Louisiana. The United States Supreme Court's holding in Pulley v. Harris is based on the particular safeguards of the California system and is restricted to that statutory framework. At least two safeguards inherent in California law are lacking in Louisiana: (i) A "special circumstance" in addition to an "aggravating circumstance" must be proven during the guilt stage before a defendant may be subjected to a subsequent capital sentence proceeding; and (ii) if a jury votes to convict and recommends the death penalty, the trial judge must independently review the evidence and verdict and concur therein, handing down his own ruling with reasons for his decision. The Pulley v. Harris opinion did not isolate or specify whether these ingredients are essential to the constitutionality *1260 of a death penalty system devoid of proportionality review. Thus, if Louisiana were to repeal its laws and rules requiring proportionality review, Pulley indicates that whether such review would be required by federal constitutional law would depend on the specific safeguards contained in our death penalty system at that time. It is self-evident that this court's prediction of the U.S. Supreme Court's decision of the issue after a repeal of proportionality review in Louisiana should await a case in which it is squarely presented.
Third, we did not grant a rehearing to consider "the role of the proportionality review provided by Supreme Court Rule XXVIII § 1(c), as part of the review for excessiveness legislatively required by La. C.Cr.P. art. 905.9, in the overall Louisiana capital sentencing system * * *" as the majority states. Our internal memorandum indicates rehearing was granted only to consider whether Welcome's capital sentence was flawed by his mental retardation in either of the ways noted above.
Fourth, the majority's dicta which attempts to characterize the constitutional guarantee against excessive punishment as a sort of warmed-over due process clause which merely requires this court's review to insure "that the jury's sentencing function was not affected or influenced by arbitrary factors" is patently incorrect. The constitution and the statutes (as well as this court's rules) require this court to review the claim of any person that he has been subjected to excessive punishment, and, in capital cases, in particular to "review every sentence to determine if it is excessive" or "is disproportionate to the penalty imposed in similar cases considering both the crime and the defendant." (emphasis added) La.Const. art. I, § 20; C.Cr.P. art. 905.9.1; See Sup.Ct.R. XXVIII. This court's duty is not merely to review the proceedings for due process. It is the sworn duty of the justices of this court to support the constitution and the laws of this state and to faithfully and impartially discharge and perform a review of each death sentence to see if it is excessive by reason of being comparatively disproportionate. La.Const. art. I, § 20; art. X, § 30; La.C.Cr.P. art. 905.9; La.C.Cr.P. art. 905.9.1.
Although I originally was of the opinion that the death penalty does not constitute excessive or erroneous punishment in this case, I cannot vote to approve the sentence under the present circumstances for several reasons: (a) Serious questions raised on application for rehearing by my colleagues and Welcome's attorney caused us to grant a hearing to consider whether his mental retardation rendered him incapable of knowingly creating a risk of death or great harm to more than one person, or makes the death penalty disproportionate in this case; (b) I do not believe a majority of this court has carefully reconsidered these questions in Welcome's case; (c) Instead, it appears that the court's attention has been deflected by a consideration of the abstract and misleading questions to which the majority opinion is primarily devoted.
NOTES
[1] La.C.Cr.P. Art. 905.9. provides:

"The Supreme Court of Louisiana shall review every sentence of death to determine if it is excessive. The court by rules shall establish such procedures as are necessary to satisfy constitutional criteria for review."
Supreme Court Rule XXVIII § 1 provides:
"Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
"(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
"(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." (Emphasis supplied.)
[2] The plurality opinion by Justice Stewart in Gregg stated:

"[T]he concerns expressed in Furman that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." 428 U.S. at 195, 96 S.Ct. at 2935.
[3] The Supreme Court of Florida, although not statutorily required to do so, has generally undertaken proportionality review. See Pulley v. Harris, above, note 8.
[4] The concurring opinion in Jurek by Justice White (the author of Pulley v. Harris,) joined by Chief Justice Burger and Justice Rehnquist, noted:

"[T]he Texas capital punishment statute limits the imposition of the death penalty to a narrowly defined group of the most brutal crimes and aims at limiting its imposition to similar offenses occurring under similar circumstances." 428 U.S. at 278-79, 96 S.Ct. at 2960.
[5] The first Roberts decision was rendered contemporaneously with Gregg. Another death penalty under a different provision of the 1973 statute was later declared unconstitutional in Roberts v. Louisiana, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977). It is interesting to note that the three-judge plurality opinion in each case was written by Justice Stewart (who is no longer a member of the Court) and that the majority was achieved by the concurrences of two justices who viewed the death penalty as unconstitutional under any circumstances. The four-judge minority (representing one-half of the eight justices who are still members of the Court) expressed the view that a mandatory death penalty for narrowly defined first degree murder was constitutional, even without any consideration of the character and propensities of the particular offender. (The first Roberts case involved a murder committed during an armed robbery, and the second Roberts case involved a murder in which the victim was a policeman who was killed in the line of duty.) Although one might speculate on how the present membership of the Supreme Court would view the constitutionality of the Roberts scheme if the question were presented today, Louisiana's present capital sentencing system includes the desirable feature of the Roberts scheme (the extremely narrowed definition of first degree murder), plus the desirable vesting of discretion in the jury to recommend a life sentence for a particular offender after a separate sentencing hearing, even though the offender has committed a homicide which qualifies as one of the most serious and aggravated first degree murders.
[6] The plurality decision in the first Roberts case identified the constitutional deficiencies of the 1973 statute as follows:

"[T]here are no standards provided to guide the jury in the exercise of its power to select those first-degree murderers who will receive death sentences, and there is no meaningful appellate review of the jury's decision". 428 U.S. at 336, 96 S.Ct. at 3007.
[7] In 1977 the Legislature "impliedly amended" the first degree murder statute to require proof of an aggravating element in the guilt phase, thereby narrowing the definition of first degree murder. See Act 121 of 1977; State v. Payton, 361 So.2d 866 (La.1978). The following year, by Act 796 of 1978, the Legislature again adopted the broad definition of first degree murder. However, the Legislature again narrowed the definition of first degree murder in Act 74 of 1979. After this series of literally annual fluctuations in attempts to insure that the statute was constitutionally acceptable, the 1979 definition has remained essentially unchanged.

For a detailed summary of the pertinent legislation, see Louisiana Judges' Benchbook, Jury InstructionsCriminal, Volume II, pp. 9-27 (La. Jud.College 1978).
[8] The present definition of first degree murder in La.R.S. 14:30 is very similar to that in the 1973 statute. However, the mandatory death penalty of the earlier statute has been deleted. The other features added in 1976 are included in La.C.Cr.P. Art. 905.1 and following.
[9] Most intentional killings are only second degree murders in Louisiana, whereas any intentional killing would classify the offender as death eligible under the Georgia statute. The effect of this restrictive feature of the Louisiana statute is arguably demonstrated by the fact that there are only about 30 persons on death row in Louisiana today. By contrast, there are 112 in Georgia and 207 in Florida. The Times-Picayune/States-Item, April 15, 1984, § 2 at 4.
[10] The Supreme Court performed a similar analysis in the Harris decision, stating:

"[A]ssuming that there could be a capital sentencing system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review, the 1977 California statute is not of that sort". ___ U.S. at ___, 104 S.Ct. at 880.
[11] Compare Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), which held that life imprisonment without possibility of parole is disproportionately excessive for the crime of issuing worthless checks.
[12] The message of Furman and Gregg to state legislators was to adopt a statute which minimized the risk of wholly arbitrary and capricious action by an "aberrant jury". 428 U.S. at 206, 96 S.Ct. at 2940. In response, the Louisiana Legislature mandated an appellate review for excessiveness as one of the means for insuring against the arbitrary imposition of capital punishment, and this court adopted a rule implementing comparative proportionality review as one of the means of testing for excessive sentences resulting from the action of an "aberrant jury".
[13] Obviously, the death penalty is imposed by juries more frequently and more consistently in cases involving the most serious aggravating circumstances, such as the killing of a policeman or fireman, or the killing of two or more victims, or a killing during the commission of a serious felony. Therefore, the Legislature's narrowing the definition of first degree murder could be expected to increase the regularity with which juries would recommend the death penalty in the fewer cases in which the juries were called upon to exercise sentencing discretion. Perhaps the theory was that the death penalty must be recommended regularly in order to obtain a deterrent effect for particular crimes, which is one of the primary objectives of capital punishment.
[14] In State v. Sonnier, 380 So.2d 1 (La.1979) (the only Louisiana case under the post-1976 statutes in which a death penalty has been set aside as disproportionately excessive), this court concluded that the jury failed to give adequate consideration to the mitigating fact that the defendant's participation was relatively minor and was so substantially influenced by the domination of his older brother that defendant otherwise would probably not have been involved in the homicide. In Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the Court held that capital punishment was a disproportionately excessive penalty in the absence of proof that the defendant, who aided and abetted a felony in the course of which a murder was committed, either killed, attempted to kill or intended to kill the victim, or that he contemplated that a killing would occur. At the time of the research project published in 74 J.Crim.L. & Criminology (1983), the Georgia Supreme Court had conducted comparative sentence reviews in 120 death penalty cases since 1973 and had vacated only two sentences as excessive or disproportionate. In one case, the defendant received the death penalty on retrial after the jury had imposed life imprisonment in the first trial. In the other, the defendant's coperpetrator, who was the actual triggerman, received a life sentence.
[15] Although this court has no prerogative to act as a "de novo" panel and to simply substitute the judgment of a majority of the justices for the considered recommendation of a properly guided jury, Louisiana's capital sentencing system does provide such a review. La.Const. Art. IV, § 5(E) (1974) recognizes the governor's authority, acting on the recommendation of a constitutionally-created board of pardons, to engage in a "de novo" review. See La.R.S. 15:572 and following.
[16] As discussed in the opinion on original hearing, the circumstances here clearly establish that defendant acted with a specific intent to kill more than one person and contemplated and actually caused the death of two persons in a single consecutive course of conduct. The evidence was clearly sufficient to support the jury's verdict of guilty of first degree murder, as well as the finding in the penalty phase of the aggravating circumstance of "knowingly [creating] a risk of death ... to more than one person". See La.R.S. 14:30(3); La.C.Cr.P. Art. 905.4(d).
[17] Indeed, unlike other cases in which the death sentence had to be set aside because the prosecutor introduced prejudice or arbitrary factors into the jury's sentencing consideration, this case presents a model of fair and evenhanded behavior by the prosecutor. For example, even after arguing the presence of the statutory aggravating circumstance, the prosecutor reminded the jurors that they still had the option of recommending life imprisonment "as you in your good judgment as the collective conscience of our community feel is appropriate".
[18] Defendant's 1977 aggravated assault conviction involved his pulling a knife during an argument in a billiards game. His 1980 battery conviction involved his hitting the victim on the back of the head with a pipe.
[19] Supreme Court Rule XXVIII § 4(b) requires the district attorney to file a memorandum reviewing all first degree murder cases in the district since 1976. This court's survey of all reported first degree murder convictions involving multiple killings in the state since enactment of the 1976 statute is attached as Appendix A.
[20] Modern capital sentencing statutes are generally designed to focus on the murderer who is likely to kill again and to screen out from consideration such persons as one who has killed in an isolated act of violence. Indeed, the Texas statute requires the jury to find affirmatively "a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society".
[*] No reported decision; case scheduled for argument on June 25, 1984.