699 So.2d 1 (1997)
STATE of Louisiana
v.
Scott Jude BOURQUE.
No. 96-KA-0842.
Supreme Court of Louisiana.
July 1, 1997.
Rehearing Denied September 5, 1997.
*4 Nicholas Joseph Trenticosta, Gary Patrick Clements, New Orleans, for Applicant.
Richard P. Ieyoub, Atty. Gen., Bernard E. Boudreaux, Jr., New Iberia, John Phillip Haney, Keith Rayne Jules Comeaux, St. Martinville, for Respondent.
TRAYLOR, Justice.
On April 15, 1990, Scott Jude Bourque murdered his estranged girlfriend, Charlotte Perry, and severely wounded her mother, Therese Stoute. He was indicted and subsequently convicted of first degree murder and received the death penalty. On appeal, this Court affirmed the conviction but reversed the defendant's sentence and remanded for another sentencing hearing. State v. Bourque, 622 So.2d 198 (La.1993). Following the second sentencing hearing, a jury again determined that Bourque should suffer the death penalty. This is the direct appeal of that sentencing hearing pursuant to Article V, Section 5(D) of the Louisiana Constitution.
On appeal, defendant asserts thirty-one assignments of error, both argued and unargued. Finding no reversible error, we affirm the sentence.

FACTS
The facts surrounding this murder are thoroughly recounted in the original opinion. State v. Bourque, 622 So.2d at 209-15. The jury found the defendant guilty of first degree murder as charged. Id at 213. Following the penalty phase of that trial, the jury recommended the death penalty, finding two statutory aggravating circumstances. Id at 215.
On direct appeal, this Court affirmed the conviction, but found that during the penalty phase the State had presented a "prohibited mini-trial" regarding evidence of other crimes which injected an arbitrary factor into the jury's sentencing determination. Id at 248. Consequently, the Court reversed the defendant's death sentence and ordered a new penalty hearing. Id at 249.
The second sentencing trial took place from September 26, 1994 to October 8, 1994. After hearing the evidence, the jury unanimously returned a verdict of death finding *5 two aggravating circumstances: (1) that the defendant knowingly created a risk of death or great bodily harm to more than one person; and (2) that the defendant was engaged in the commission or perpetration or attempted perpetration of aggravated burglary.
This Court once again considers the death sentence of Scott Jude Bourque.

DISCUSSION

Diminished Juror Responsibility
In three assignments of error, the defendant assigns as error that the trial court allowed the prosecutor to use the word "recommendation" during voir dire in discussing the decision that the selected panel would have to make. Defendant contends that the prosecutor effectively diminished the solemn responsibility of the jury to the point that the jury believed that the responsibility for their determination lay elsewhere.
Defendant specifically complains of the following language used by the prosecutor during voir dire: "You are not going to be the one who will be inflicting the death penalty. You are going to be recommending something to the court." Defendant further complains that the prosecutor repeatedly made use of the term "recommend" throughout voir dire and made several remarks that the jurors would be making a recommendation to the court.[1] Defendant contends that such references so tainted the perceptions of the jurors as to diminish their role as decision makers while transplanting the true responsibility to the system.
"[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). This Court has consistently held that where a prosecutor's references to appellate review of a death sentence conveys the message that the jury's solemn responsibility is diminished because their decision is not final because it is reviewable, the defendant has not had a fair trial and the penalty must be reversed. E.g., State v. Clark, 492 So.2d 862 (La.1986). However, we have consistently insisted that the references must be viewed in the context in which they were made and remarks which, taken in context, would not reasonably induce a juror to believe that his responsibility is lessened by appellate review do not constitute reversible error. Id at 871. Given that the review of death sentences by appeal is such common knowledge, there can be no absolute prohibition against references to appellate review. State v. Berry, 391 So.2d 406, 418 (La.1980). Rather, the remarks must be reviewed in context to determine whether the references were such that would induce a juror to disregard his responsibility. Id.

Here, it cannot be said that the prosecutor's remarks were such that the jurors were led to believe that the responsibility lay elsewhere. Here, there were no remarks rising to the level of the prosecutor's repeated assurances to the jurors in Caldwell that "your decision is not the final decision" and "your job is reviewable." Caldwell, 472 U.S. at 325, 105 S.Ct. at 2637. The prosecutor's remarks here were limited to statements that the jury would be making a recommendation to the court. This Court has previously rejected the argument that framing the jury's decision as "recommendations" lessened the jury's appreciation of their responsibility. State v. Summit, 454 So.2d 1100, 1108 (La. 1984), cert. denied, 470 U.S. 1038, 105 S.Ct. 1411, 84 L.Ed.2d 800 (1985). Furthermore, the prosecutor's remarks were limited only to voir dire and were not later repeated.
Additionally, and significantly, the trial court repeatedly instructed the jury as to their responsibility. Prior to the voir dire of each panel the judge explained the responsibility of the jurors in language such as:

*6 Your job will be to decide whether the defendant should be sentenced to death or to life imprisonment without benefit of parole, probation, or suspension of sentence. It will be your job to consider the circumstances of the events and the character and propensities of the defendant in determining the sentence to be imposed.
Before the jury retired to deliberate the judge instructed them again as to their responsibilities in language so unequivocal that there could be no mistake that the decision of whether or not to impose the death penalty was theirs alone. The judge began the instructions with: "Ladies and gentlemen, we're now at the second-to-last stage, me giving you the instructions, and then you deliberate and return a verdict." The judge also instructed, "You must now decide whether the defendant should be sentenced to death or to life imprisonment ..." Later, he instructed, "Now in reaching your decision regarding the sentence to be imposed, you must be guided by these instructions." Still later, "Now if you find beyond a reasonable doubt that an aggravating circumstance existed, then you may consider imposing a sentence of death. The finding of an aggravating circumstance does not mean that you must impose a death penalty." Further along, the judge plainly stated, "It is your responsibility, in accordance with the principles of law that I have instructed you on, to determine whether the defendant should be sentenced to death or life imprisonment without benefit of probation, parole or suspension of sentence."
Beyond these verbal instructions, the jury verdict form also clearly delineates that it is the jury's responsibility to determine whether or not to impose the death penalty with the language: "... THE JURY UNANIMOUSLY DETERMINES THAT THE DEFENDANT SHOULD BE SENTENCED TO DEATH."
We considered a similar assignment of error with virtually identical instructions in State v. Tart, 672 So.2d 116 (La.1996) wherein we determined that "[n]o juror could have failed to appreciate the nature and gravity of the jury's death penalty decision." Id at 150. Likewise, in the instant case, considering the prosecutor's remarks in the context of the entire proceeding, as we must, including the foregoing unequivocal instructions by the court, we find that no juror could have failed to appreciate the gravity of the jury's responsibility in determining whether or not to impose the death penalty on defendant Bourque.
While we do not approve of the prosecutor's complained of remarks by use of the word "recommendation" in discussing the jury's role, his remarks did not rise to the proscribed level which would induce the jury to believe that the responsibility for determining whether or not to impose the death penalty rests elsewhere. Furthermore, his remarks were limited to voir dire and the trial court cured any possible misperceptions by repeatedly emphasizing the jury's actual responsibility. Therefore, we find that the prosecutor's remarks do not constitute reversible error under Caldwell and this state's jurisprudence. Accordingly, we find assignments of error four, ten, and eleven to be without merit.
Race-based and Gender-based Batson Challenges.
Defendant assigns as error that the trial court dismissed, without ruling, defendant's gender-based Batson challenge to the prosecutor's use of peremptory challenges against five female potential jurors. Defendant also assigns as error in two unargued assignments that the trial court erred in ruling that the defendant had failed to establish a prima facie case of racially discriminatory use of a peremptory strike against prospective juror Howard, a black female.
Near the end of voir dire, the State excluded prospective juror Howard by way of a peremptory challenge. The defendant then made a Batson challenge alleging racial discrimination by the State. The defendant asserts that he later enhanced this challenge to include an allegation of gender-based discrimination. The trial court ruled that the defendant had not established a prima facie case of discrimination.
Equal protection prohibits the peremptory challenge of a prospective juror based on race. Batson v. Kentucky, 476 U.S. *7 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It is the equal protection rights of the prospective juror, as well as the defendant, which are protected by Batson and its progeny. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Regardless of his own race, a defendant can assert, via Batson, the right of a prospective juror to be free from a racially discriminatory peremptory challenge. Id. Because it is the prospective juror's rights that are being protected, the State may also make a Batson challenge to the defendant's discriminatory use of a peremptory challenge.[2]Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992). Batson also has been extended to afford protection to other categories and most recently has been extended to protect against discrimination based on gender. J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
Regardless as to whether the challenge is gender-based or race-based, the challenging party, the defendant here, bears the initial burden of establishing a prima facie case of the State's discriminatory use of a peremptory strike. J.E.B., 511 U.S. at 145, 114 S.Ct. at 1429-30; Batson, 476 U.S. at 96-97, 106 S.Ct. at 1722-23; State v. Green, 655 So.2d 272, 287 (La.1995). The defendant may satisfy this burden by offering any relevant facts on the issue, including, but not limited to, a pattern of strikes, statements or actions which support an inference of impermissible motivation, the composition of the jury finally empaneled, and any other facts which show a disparate impact upon the alleged victim class. State v. Green, 655 So.2d at 288.

Race-based Batson Challenge.
The defendant complains that the trial court improperly ruled that the defendant had failed to establish a prima facie case of racially discriminatory use of a peremptory strike. The record shows that the trial court kept meticulous notes regarding matters of both gender and race when jurors were peremptorily struck.[3] In making the complained of ruling, the trial court acknowledged that two other prospective black female jurors had been struck prior to Howard, noting that one had discussed religious objections to the death penalty. The trial court noted that the State had also peremptorily challenged two prospective white jurors as well and further noted that four black jurors had been selected without strike.
Given the trial court's discretion in determining whether the defendant has made a prima facie case, the prosecutor's use of strikes against both black and white prospective jurors, the number of black jurors actually seated on the jury, and the defendant's having made no argument beyond pointing out that the State had used peremptory strikes against three prospective black jurors, we find nothing to indicate that the trial court's ruling was improper. For the foregoing reasons, we find that assignments of error fourteen and fifteen to be without merit.

Gender-based Batson Challenge.
The defendant's asserted gender-based Batson challenge was based upon the same peremptory strike of prospective juror Howard. During the course of his race-based Batson challenge, the defendant made several references to the fact that the three prospective black jurors that the State had used strikes against were also female. Although the defendant did not cite to J.E.B., nor expressly state that he was making a gender-based Batson challenge, in the course of his race-based challenge the defendant did state:
... [the prosecutor] has systematically excluded members of the black race and he has even narrowed it down to black members that are female of the black race. So because of the nature of our challenge it goes to all females that he's been doing that; but we feel like we have made a strong prima facie case ...
*8 Defendant correctly points out in his brief that the law of J.E.B. is applicable to this case.[4] Assuming that the defendant properly conveyed to the trial court that he was making a gender-based Batson challenge, the defendant nonetheless incorrectly argues that the trial court "completely ignored and dismissed defense counsel's claim of gender discrimination ... in direct contradiction to the holding of J.E.B." Conversely, a review of the record reveals that the trial court did, in fact, consider the defendant's references to gender-based discrimination along with the defendant's express race-based Batson challenge when the court ruled that the defendant had failed to make a prima facie showing of discrimination as required by Batson and its progeny. In making its ruling, the trial court stated:
In the exercise of five challenges, three of the challenges have been against blacks, two of the challenges have been against whites. For whatever gender, whatever part gender may play, all are females. I can't say that that would establish a primarya prima facie showing, that it isif it's a proper Batson challenge, and I would so rule.
After noting the number of black jurors on the panel that the prosecutor did not strike, the court added, "As I say in advance of that I have ruled that I don't think that that's a prima facie showing."
From the court's statement, it is clear that the court did consider gender: "whatever part gender may play," and subsequently ruled that the defendant failed to establish a prima facie showing. It would strain logic to say that a defendant can simultaneously assert a gender-based challenge along with a race-based challenge by simply mentioning gender within the race-based challenge, yet hold that a trial court could not likewise dispense with both.
Furthermore, we agree with the trial court's finding that the defendant failed to establish a prima facie case of gender-based discrimination. Prior to the defendant's challenge, the State had accepted a total of six prospective female jurors, four of whom were eventually empaneled and an additional two whom the defendant peremptorily struck after the State had accepted them. Thus, while the State peremptorily struck five prospective female jurors, it accepted six. Considering the prosecutor's acceptance of six females, and the defendant's failure to show any pattern of discrimination beyond a bare allegation, we find that the defendant failed to make a prima facie case of gender-based discriminatory use of peremptory strikes.
Based on the foregoing reasons, we find that the trial court properly ruled that the defendant failed to make a prima facie case of gender-based discriminatory use of peremptory strikes by the prosecution. Accordingly we find no merit in defendant's assignments of error twenty-one and thirty.

Jury Instructions
The defendant contends that the trial court erred in failing to instruct the jury that it had to find proof beyond a reasonable doubt of each element of each aggravating circumstance before it could find the existence of that aggravating circumstance. Defendant also urges that the trial court diluted the State's burden of proof.
Defendant argues that the jury instructions were incomplete because a "how to" instruction was lacking. Defendant states that the "jury was uninstructed on the essential elements of the charge ... which the jury must find beyond a reasonable doubt in order to convict the defendant of the crime charged."
A review of the record demonstrates that the trial judge appropriately instructed the jury regarding the law applicable to the case. The defendant plainly concedes that the judge gave proper instructions of the definition of each relevant crime, including the definitions of the components of each of the two aggravating circumstances. The defendant also concedes that the court gave proper instructions as to the burden of proof the State bore. The defendant also concedes that the judge properly defined the following specific legal terms: aggravate, mitigate, attempt, character, propensity, specific and *9 general intent, and direct and circumstantial evidence.
The defendant points to no improper definitions nor to any omitted definitions. Likewise, the defendant makes no allegations of any improper instructions. Defendant essentially argues that although the court properly provided all applicable definitions and properly instructed the jury that they "must unanimously find beyond a reasonable doubt that at least one aggravating circumstance existed," the court should have further explained to the jury how to apply the definitions and should have also explained that they must find each element of the aggravating circumstance beyond a reasonable doubt.
After exhaustive voir dire, opening statements, closing arguments, and the jury charge, there could be no doubt in the mind of any juror that the State had to prove beyond a reasonable doubt the existence of one or both of the aggravating circumstances.
The defendant does not argue that this jury failed to understand or were incapable of integrating the plain language of the definitions and instructions. Nor would the record support such an argument. Rather, the defendant contends that a jury instruction which lacks their argued "how to" instruction is defective. We disagree. The trial court, as defendant concedes, properly instructed the jury as to the State's burden and provided all relevant definitions. Here, as elsewhere, "[c]redit should be accorded to the good sense and fairmindedness of the jurors who heard the evidence." State v. Jarman, 445 So.2d 1184, 1188 (La.1984). There is no need to further explain to the jury how to integrate definitions. Nor is there a need to explain in greater detail the burden of proof required of the State.
Defendant also contends within this assignment that the court erred by not further defining the aggravator: "the offender knowingly created a risk of death or great bodily harm to more than one person" pursuant to La.Code Crim.P. art 905.4(A)(4). Defendant now asserts that the court should have instructed the jury that the offender's creation of the risk of death or great bodily harm must be in the context of "a single, consecutive course of conduct."[5]
Initially, contrary to defendant's assertion that the court failed to define the aggravator "pursuant to La.Code Crim.P. art 905.4(A)(4)," the trial court in fact used the language directly from La.Code Crim.P. art 905.4(A)(4).
Secondly, the facts show that the defendant did create a risk of death to more than one person in a single, consecutive course of conduct. The defendant undisputedly engaged in a single course of conduct which contemplated and actually resulted in the death of the victim and the near-fatal shooting of the victim's mother. The defendant, armed, entered the Stoute residence without the permission of either Therese Stoute or her son, Michael Perry, who answered the door. Defendant grabbed Charlotte Perry and dragged her down the hall. Mrs. Stoute attempted to stop the defendant, but he shoved a pistol-grip shotgun into Mrs. Stoute's throat. Reacting quickly, Mrs. Stoute grabbed the barrel and pushed it away as the defendant pulled the trigger. The ensuing blast severely wounded her and would have certainly killed her had she not reacted as she did. Thereafter, the defendant pulled Charlotte Perry outside, attempted to make her get into his vehicle and when she would not, he shot her. The defendant then, after watching the victim's brother retreat, walked back to Ms. Perry and shot her three more times.
Finally, the relevant inquiry is not whether jurors could have applied the court's instruction in an unconstitutional manner, but whether there is a reasonable likelihood that they did apply it in an unconstitutional manner. Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994). Given the facts of this case, the defendant cannot show a reasonable probability that the jurors did not find the aggravator in the *10 context of a single, consecutive course of action. Indeed, the defendant concedes that the jurors could have found this aggravator in a "legally correct" manner and does not argue a reasonable likelihood that they did not do so.
For the foregoing reasons, we find that assignment of error twenty-nine to be without merit.

Mitigating Circumstances
Defendant argues that "[t]o instruct the jury on the entire list of mitigating circumstances serves only to denigrate the importance of mitigating evidence" and now contends that the trial judge should have only instructed as to only those relevant mitigating circumstances. Notwithstanding the obvious difficulties of attempting to discern precisely how many mitigating instructions are correct, La.Code Crim.P. art 905.3 provides: "The court shall instruct the jury concerning all of the statutory mitigating circumstances." This Court has previously addressed this argument and held that there is no error in charging on all statutory mitigating circumstances in accordance with Louisiana's capital sentencing provisions. State v. Hamilton, 681 So.2d 1217, 1228 (La. 1996). Assignment of error thirty-one lacks merit.

Anti-Sympathy Instruction
By assignment of error number three, defendant argues that it was error for the trial court to allow the prosecutor to tell potential jurors during voir dire that they must not permit the testimony of defendant's daughter to be the sole reason for not voting for the death penalty. Defendant asserts that this "error" was compounded when "the court improperly issued an anti-sympathy instruction to the jury" prior to deliberations: "Now you are not to be influenced by sympathy, passion, prejudice, or public opinion."
Contrary to defendant's assertion, the record reveals that the prosecutor was simply inquiring during voir dire whether knowledge that the defendant had a loving daughter would preclude the jurors from being able to consider the death penalty. The voir dire also reveals that the defendant like wise pursued the same line of questioning regarding the victim's mother and family, inquiring whether sympathy for the victim's family alone would cause a juror to conclude that the death penalty was warranted.
This Court has upheld identical instructions that the jury remain uninfluenced by sympathy, even during the penalty phase. State v. Brogdon, 457 So.2d 616, 629 (La. 1984). As we concluded in Brogdon, the instruction does not direct the jury to eschew sympathy specifically for the defendant; but rather to eschew sympathy altogether. Here, as in Brogdon, the judge instructed the jury that they must also consider any other relevant mitigating circumstances in favor of the defendant. We are unpersuaded by defendant's attempt to twist this established proper jury instruction into one by which jurors would be instructed to remain uninfluenced by sympathy for the victim only, when the proper instruction cautions jurors from being influenced by sympathy for either the defendant or the victim. The prosecutor's voir dire questioning was likewise proper. This assignment lacks merit.
Character and Propensity Testimony
Defendant contends that the trial court erred by allowing the testimony of witnesses Jennifer Beyer, Maria Olivier, and Tina Horn. The defendant complains that the State failed to timely provide notification of statements made by defendant to which witnesses Breyer and Olivier testified.
Initially, because Tina Horn did not testify at all, we find no error in regards to that portion of defendant's argument.
On October 5, 1994, Maria Olivier and Jennifer Beyer both testified regarding a January 17, 1990 incident that occurred in the lobby of the law office where the victim worked at the time. Both witnesses testified to the defendant's use of extremely derogatory language toward the victim and Ms. Beyer. The testimony was not offered as evidence of other crimes nor was it offered as an inculpatory statement. Rather, the testimony went to the character and propensities of the defendant, an area clearly relevant and within the proper scope of a capital sentencing *11 hearing. La.Code Crim.P. art. 905.2. On October 2, 1994, six days after the sentencing proceedings began, the State provided written notice of their intent to use the statements. The defendant objected on October 3, 1994 and during the ensuing arguments which continued intermittently until just prior to opening arguments, the State provided written notice of intent to introduce the defendant's statements as evidence of true character and propensity. Although the trial court initially ruled that the State would not be allowed to introduce the statements during their case-in-chief, he later requested argument on the issue. Following the subsequent hearing, the defendant sought additional time and the court granted both sides until the following morning and requested memoranda. Then, after a forty-five minute recess, the proceedings continued until 4:20 PM.
The following morning, counsel resumed argument as to the admissibility of the defendant's statements made in the presence of witnesses Beyer and Olivier. In response to defendant's complaint that he was mid-trial without benefit of co-counsel, the State suggested as an appropriate remedy a recess or a delay in order to allow the defendant time to interview the witnesses and prepare. The State also offered to make the witnesses available for such interviews. However, the defendant insisted on continuing the proceedings and countered by requesting that the court consider the "other alternative" remedy of excluding the testimony. The court ruled that he would allow the testimony. In so ruling, the court expressly acknowledged the notice requirements of La.Code Crim.P. 716(B).
La.Code Crim.P. 716(B) requires the district attorney, upon motion by the defendant, to inform the defendant of the existence, but not the contents, of any statement made by the defendant which the prosecutor intends to offer at trial. La.Code Crim.P. 729.5 provides an array of possible sanctions available to the court where a party has failed to comply with discovery. Among the listed remedies are the granting of a continuance, exclusion of the evidence, or any appropriate order. It is within the trial court's discretion to exclude the evidence or enter any appropriate order to remedy a party's violation of a discovery right. State v. Seals, 684 So.2d 368, 378 (La.1996).
Here, defendant argues that he was prejudiced by the State's delayed notice because he was unable to adequately prepare to defend against the information presented. However, the State suggested a recess or delay for the defendant to have time to interview the witnesses at issue and prepare for his examination. There is nothing in the record to indicate that the trial judge would have refused to accept the State's suggestion had the defendant not adamantly insisted on proceeding. Further, we believe that such a recess would have been amply sufficient to remedy any possible prejudice caused by the State's late notice. When considered in light of defendant's insistence on "all or nothing" as to exclusion of the evidence or no remedy at all, despite the State's suggestions, the defendant's argument that he was prejudiced by the State's late notice fails. Though a defendant need not object to preserve error during a capital sentencing hearing, a defendant may not cause the error which he later asserts as prejudicial.
For the foregoing reasons, we find assignments of error one, two, seventeen, and eighteen to be without merit.

Unargued Assignments of Error
Defendant proffered several formal assignments of error for which he did not provide any argument beyond the assignment itself.[6]
In unbriefed assignments twelve and thirteen, defendant complains of statements made by the trial court and the prosecutor during voir dire. In assignment twelve he complains that the court instructed potential jurors "that they must consider aggravating factors when determining punishments." *12 This is a wholly correct statement of the law. La.Code Crim.P. arts. 905.2, 905.3, 905.4, 905.7. In assignment thirteen, he complains that the prosecutor told potential jurors "that they should not consider sympathy when determining the appropriate sentence." This is also a correct statement of the law. State v. Brogdon, 457 So.2d 616, 629 (La.1984). Assignments twelve and thirteen are without merit.
In unargued assignment number eight, the defendant contends that the trial court erred in allowing the State to "admit gruesome photographs of the victim." The trial court allowed the introduction of the photographs citing several reasons, including La.Code Crim.P. art. 905.2(A) which provides: "The jury may consider any evidence offered at the trial on the issue of guilt." In addition to Article 905.2(A), this Court previously ruled in the first review of this case that these same photographs were relevant and probative in proving the State's case and were not "so gruesome as to overwhelm the juror's reason." State v. Bourque, 622 So.2d 198, 236 (La.1993). In the instant hearing, during the defendant's attempt to exclude the photographs via stipulation, the State pointed out that in addressing the exact evidence, this Court had held that "the defendant cannot deprive the State of the moral force of its case by offering to stipulate to what is shown in photographs." Bourque, 622 So.2d at 236. (citing to State v. Perry, 502 So.2d 543, 559 (La.1986) cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987)). As before, we find that the evidence is admissible. This assignment is without merit.
In assignment number nine, the defendant asserts that the trial court erred "each time it refused a jury charge offered by defendant." The defendant tendered ten proposed special jury charges. Because the charge conference took place off the record in chambers and as this is an unbriefed assignment, we have no indication as to which of the defendant's proposed charges were refused or which may have been abandoned because their substance was already contained within the general charge. Nonetheless, a review of the proposed charges reveals that most of their content was included within the general charge to the jury and much of the language contained in the proposed charges appeared verbatim in the general charge. Neither the record nor the defendant demonstrates that the trial court's refusal to accept the defendant's proposed charges was error. This assignment lacks merit.
In assignment sixteen, defendant contends that the trial court erred in overruling defendant's objection to the State's introduction of the "Huebner film." No such evidence was admitted. Thus, this assignment lacks merit.
Assignment twenty complains that the trial court erred by denying defendant's motion to review the personnel records of "Duke" Needham, a potential witness for the State. As Mr. Needham did not testify, this assignment is without merit.
In assignment number nineteen, defendant contends that it was error for the trial court to excuse for cause jurors who stated they could not consider voting for the death penalty because of religious beliefs and scruples. This contention is in direct contradiction to the law of this state. La.Code Crim.P. art. 798 expressly provides that it is good cause for challenge that a prospective juror in a capital case could not consider voting for the death penalty because of religious beliefs and scruples. La.Code Crim.P. art. 798(2). This assignment lacks merit.
Defendant, in assignment twenty-two, asserts that the trial court's denial of his motion to exclude the aggravating circumstance of aggravated burglary was reversible error. Presumably, this assignment, unbriefed, is based upon the State's filing of its motion to include this aggravator one legal day after the date set by the trial court for the filing of motions.
In response to a writ filed by defendant, this Court ruled on June 17, 1994 that the State could not use aggravated kidnapping as an aggravating circumstance, State v. Bourque, 640 So.2d 1317 (La.1994), thus leaving the State with only that the defendant knowingly created a risk of death or great bodily harm to more than one person as an aggravating circumstance. The State subsequently filed its motion to amend to include aggravated burglary on August 2, *13 1994, fifty-five days before trial. Defendant contested on the grounds that the courtimposed deadline had passed by one day at the time the State filed its motion. The trial court heard arguments on the issue and granted the State's motion.
The defendant is entitled to notice of the aggravating circumstances upon which the State will rely in sufficient time to afford a reasonable opportunity to prepare. State v. Sonnier, 379 So.2d 1336, 1356 (1980). However, defendant makes no argument nor shows any prejudice nor points to any law which would preclude the State from alleging the additional aggravator. The State had the right to allege and prove the additional aggravator after this Court decreed that it could not use aggravated kidnapping. The mere fact that the State filed its motion to amend one legal day after the court's selfimposed deadline does not show prejudice toward the defendant, nor has the defendant shown any prejudice. This assignment is without merit.
In assignment twenty-six, defendant argues that the jury's determination of sentence was invalid because there was no agreement on the underlying felony to support the aggravating circumstance of aggravated burglary.[7] Initially, we note that the only possible supporting felony included in the jury instructions was simple kidnapping. Furthermore, there is no requirement that the jury agree on which felony the armed perpetrator intended when he entered even if the State had submitted several named and defined felonies. See Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). The claim of invalidity due to lack of juror agreement is neither factually nor legally supportable. This assignment lacks merit.
Defendant states, in assignment twenty-seven, that Louisiana's death penalty scheme is unconstitutional on its face and as applied in this case. Louisiana's bifurcated capital sentencing scheme is modeled on Georgia's statute which was upheld in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Louisiana's scheme narrows the substantive definition of first degree murder to restrict the class of death-eligible cases and further provides for a sentencing hearing in which the jury may make a binding decision that the defendant receive a sentence of life imprisonment. Thus, it passes Eighth Amendment constitutional muster. State v. Welcome, 458 So.2d 1235, 1251-52 (La.1983).
In the final unargued assignment of error, defendant asserts that the cumulative error in this case requires reversal. We have carefully reviewed each of the defendant's assignments of error and determined that none constitute reversible error. As this Court stated in State v. Copeland, 530 So.2d 526, 544-45 (La.1988), "... the combined effect of the incidences complained of, none of which amounts to reversible error, did not deprive the defendant of his right to a fair trial."

CAPITAL SENTENCE REVIEW
Article I, Section 20 of the Louisiana Constitution prohibits cruel, excessive or unusual punishment. Pursuant to La.Code Crim.P. art. 905.9 and Supreme Court Rule XXVIII, this Court reviews each death sentence imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, this Court considers whether the sentence was imposed under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to statutory aggravating circumstances; and whether the sentence is disproportionate considering both the offense and the offender.
Defendant is a white male who was 33 years old at the time of the offenses. He is divorced and has one daughter. He is the *14 only child of his parents, who are divorced."[8] The defendant completed school through the eleventh grade and subsequently earned a GED. Notwithstanding his failure to complete high school, psychiatric and related examinations reveal that the defendant has an I.Q. of over 100, which is considered high. The evaluations also reveal that the defendant was able to distinguish right from wrong, able to adhere to the right, and able to intelligently assist in his own defense. The defendant's work history includes work at a service station, sales, and farm labor. The defendant has an extensive criminal history: convicted in 1973 for distribution of cocaine and LSD (later pardoned in 1980); convicted in 1976 for criminal mischief; convicted in 1978 for DWI; convicted in 1980 for simple battery; convicted in 1982 for disturbing the public and simple battery; convicted in 1983 for simple battery; and convicted of second degree murder for the of killing Jasper Fontenot earlier the same night that he killed Charlotte Perry.

Passion, Prejudice and Other Arbitrary Factors
Aside from those complained of in specific assignments of error which we have previously discussed, the defendant fails to make any argument regarding this claim. We found those specific assignments lacked merit for the reasons set forth in the discussions regarding those assignments. Furthermore, we find nothing to establish that passion, prejudice or any other arbitrary factors were otherwise introduced into the proceedings or contributed to the jury's decision.

Aggravating Circumstances
At trial, the State relied upon two aggravating circumstances: (1) the offender knowingly created a risk of death or great bodily harm to more than one person and (2) the offender was engaged in the commission or perpetration or attempted perpetration of aggravated burglary. The jury found the existence of both.
The State's evidence establishes that the murder of Charlotte Perry was committed by an offender who knowingly created a risk of great bodily harm to more than one person. The defendant shoved the barrel of a pistolgrip shotgun into the throat of the victim's mother, Therese Stoute. But for Stoute's reaction and attempt to bat away the barrel, which deflected the barrel such that it was her shoulder, instead of her throat, which bore the brunt of the point-blank blast, there would likely have been two killings at the Stoute-Perry residence on April 15, 1990. Regardless, the defendant clearly created the risk of great bodily harm, if not death, to Ms. Stoute.
As to the second aggravator, the State's evidence overwhelmingly established that the defendant killed Charlotte Perry while engaged in the perpetration of an aggravated burglary. The State proved that the defendant entered the Stoute-Perry residence without authority or consent. The State proved that the defendant was armed with a pistol-grip shotgun when he entered. The State's evidence also proved conclusively that the defendant entered with the specific intent to commit a felony therein, that felony being the simple kidnapping of Charlotte Perry.

Proportionality
Although the Federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), this Court reviews sentences of death to determine whether the penalty is disproportionate to the penalty imposed in other cases, considering both the offender and the offense.
The State's Sentence Review Memorandum reveals that since 1976 jurors in the Sixteenth Judicial District have recommended the death penalty on five occasions. The six other first degree murder jury convictions resulted in jury recommendations of life imprisonment, one of which is attributable to the request of the victim's father. In two other first degree murder convictions, the defendants received life imprisonment as a result of plea agreements. Of the five jury recommendations of the death penalty, one was the first sentencing of defendant Bourque, State v. Bourque, 622 So.2d 198 (reversed because of State's presentation of a "prohibited mini-trial" on defendant's killing *15 of Jasper Fontenot earlier in the same evening as the instant offenses), one is pending appeal in this court, State v. Connelly, 96-1680 (appeal pending), and another was remanded for sentencing to life imprisonment. State v. Eddie James Sonnier, 380 So.2d 1 (La.1979)(the only capital sentence to date which this Court has vacated as disproportionate). The two remaining cases are State v. Elmo Patrick Sonnier, 402 So.2d 650 (La.1981), and State v. Welcome, 458 So.2d 1235 (1983).
In the case of Elmo Sonnier, the jury found five aggravating circumstances, four of which were upheld on appeal: the defendant was engaged in the perpetration of aggravated kidnapping, aggravated burglary, and armed robbery; and the defendant knowingly created a risk of death or great bodily harm to more than one person. In that case, the defendant and his brother, Eddie, see State v. Eddie Sonnier, 380 So.2d 1, posing as police officers, kidnapped two youngsters from their parked car. The defendant then drove the victims to a remote area, where he left his brother with the male victim while he raped the female victim. His brother also raped the female. Later, after having the two victims lie on the ground, the defendant shot each victim in the head. Sonnier was convicted on two counts of first degree murder and sentenced to death for both.
In State v. Welcome, the jury found two aggravating circumstances: the defendant knowingly created a risk of death or great bodily harm to more than one person, and the offense was committed in an especially heinous, atrocious or cruel manner. The defendant, following a quarrel with the victims, shot one of the victims three times at close range, then followed him around a corner of a house and shot him several more times. The defendant then reloaded and ran down the other victim and shot her several times. Defendant Welcome was convicted of two counts of first degree murder and the jury recommended a life sentence for the first victim and the death penalty for the second.
Similarly, in the instant case, the jury found the aggravating circumstance of knowingly creating a risk of death or great bodily harm to more than one person. The seemingly calculated nature of the killings is also common to all three cases. Defendant Bourque first shot Charlotte Perry once, then after the victim's brother retreated, Bourque "walked back to Ms. Perry, raised the pistol, and shot her three more times as she lay on the ground." State v. Bourque, 622 So.2d 198, 210 (La.1993). Likewise, evidence presented to the jury regarding the killing of Jasper Fontenot earlier the same evening shows that defendant Bourque first shot him once, then after saying, "That wasn't enough," shot him twice more.
The instant case, along with Sonnier and Welcome, involved multiple victims and murders, the commonality of calculated killings, and the common aggravating circumstance of knowingly creating a risk of death or great bodily harm to more than one person. Considering the above, we find that the instant sentence of death is not disproportionate to the crime.
Furthermore, although this Court reversed defendant Bourque's initial death sentence because the State injected an arbitrary factor via the "mini-trial" as to the earlier killing of Jasper Fontenot, a crime for which the defendant has subsequently been convicted of second-degree murder, this is the second time a jury has imposed the death penalty on the actual facts of this case. State v. Bourque, 622 So.2d 198 (La.1993).

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La. R.S. 15:567, until (a) defendant fails to petition the United States Supreme Court timely for certiorari; (b) that Court denies his petition for certiorari; (c) having filed for and been denied certiorari, the defendant fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (d) that Court denies his application for rehearing.
MARCUS, J., not on panel. Rule IV, Part 2, § 3.
NOTES
[1] We note that the defense counsel did not object to the prosecutor's remarks; however, this is not prejudicial. Unlike the guilt phase, the scope of review of the sentencing phase of a capital case is not limited to errors which were contemporaneously objected to. State v. Seals. 95-0305 (La.11/25/96); 684 So.2d 368, 373.
[2] Indeed, the State made an unsuccessful Batson challenge complaining of the defendant's striking of prospective white jurors the day before the defendant's Batson challenge. The court ruled that the State failed to make a prima facie case of discriminatory use of peremptory strikes.
[3] In addition to the record of the discussion during this challenge, this is also made apparent by the record regarding the prosecutor's Batson challenge the day prior.
[4] Defendant's trial began in August, 1994. J.E.B. v. Alabama was rendered in April, 1994.
[5] Although objection is not required to preserve error, see note 1 supra, we note that at trial defendant neither objected to the instruction as given nor tendered any alternatives such the one he now asserts.
[6] Among the unbriefed assignments of error are several which are factually and substantively vague. Furthermore, a review of the record does not reveal what the defendant may be alleging as error. Consequently, these assignments, numbered 5, 6, 7, and 23, are unreviewable. See La.Code Crim.P. art. 920. Additionally, unbriefed assignments 24 and 25 complain of alleged errors which are included and discussed within the Capital Sentence Review.
[7] The court properly defined aggravated burglary as: "the unauthorized entering of any inhabited dwelling with the specific intent to commit a felony therein if the defendant is armed with a dangerous weapon after entering or commits a battery upon any person while in such place, or commits a battery while entering or leaving such place."
[8] We note that according to testimony, after killing Charlotte Perry, the defendant was planning, to contact someone he referred to as his brother to obtain assistance in fleeing the country.